UNITED STATES, Appellee

v.

BENJAMIN G. DACANAY, Department of
the Army Civilian, Appellant

4 USCMA 263, 15 CMR 263

No. 3040

Decided May 14, 1954

LT COL Edgar R. Minnich, U. S. Army, CAPT William C. Irby, Jr., U. S.
Army, and 1ST LT Alexander J. Jemal, Jr., U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and MAJ Irvin M. Kent, U. S.
Army, for Appellee.

PAUL W. BROSMAN, Judge:

The accused, Benjamin G. Dacanay, a civilian employed by the United States at Camp Boone, Okinawa, was tried by general court-martial under a specification alleging that he "did, at Army Post Office 719, on or about 18 November 1952, murder Guillermo V. QUINOLA by means of shooting him with a pistol." The court found the accused guilty of unpremeditated murder as charged—a violation of the Uniform Code of Military Justice, Article 118, 50 USC § 712—and sentenced him to confinement at hard labor for 20 years. The convening authority approved the findings, but reduced the period of confinement to fifteen years. Following affirmance by a board of review, we granted the accused's petition for review in order to determine the correctness of the law officer's instructions.

## II

The background of the present homicide is not an uncommon one, although certain unusual features are present. Several weeks prior to the killing, Quinola, a fellow worker and close friend of the accused, introduced the latter to one Chieko, an Okinawan girl with whom Quinola had been intimate. The accused's acquaintance with Chieko progressed rapidly to a similar relationship. Thereafter by mutual agreement, the accused and Quinola shared Chieko's affections on alternate nights. This idyll of communal love and living terminated after a time, when the girl learned that gossip had reared its ugly head. Thereupon she informed the accused and Quinola that she could no longer accept the attentions of *both*.

The parties then agreed that—pursuant to the girl's choice—Quinola would transfer his interests and the accused would succeed to primacy in Chieko's affections. Subsequently she and the accused arranged that she should remove to another residence of greater convenience to him. However, when he appeared to assist in the transportation of the girl's effects at the appointed time, she was not to be found. The accused returned to Camp Boone to attend to other affairs, but later that evening procured his pistol and entered the dwelling of Chieko, who was still absent. After placing the pistol beneath a pillow, he lay down to sleep. Shortly thereafter, he was awakened by the sound of her return, accompanied by Quinola. The only direct evidence of what happened thereafter was supplied by the pretrial statements of the accused and through his testimony from the witness stand. In both he asserted that he had inquired of Quinola why the latter had violated the tripartite agreement under which Chieko was to be left to the accused. According to the accused, Quinola advanced toward him. Fearing an assault, the accused sought his pistol and drew back the slide, loading and cocking the weapon. The gun was discharged, and Quinola was killed instantly by a bullet which pierced his heart. Almost immediately the accused surrendered to military authorities.

The accused consistently denied that he intended to kill the deceased, and emphasized that the two had enjoyed an extremely close friendship. Dacanay explained that he had taken his .22 pistol to Chieko's establishment as a protection against thieves, of whom one of the latter's neighbors had recently been the victim. According to the accused, his knowledge of the firearm was meager. To corroborate his veracity as a witness and his character for peacefulness, the accused tendered several character witnesses, who testified tellingly in his favor.

## III

The specification used by the accuser properly described a violation of either subdivision (2) or subdivision (3) of Article 118 of the Code, supra. Under such a specification the Government may establish an accused's guilt by proof either that he intended to kill his victim or to do him great bodily harm, or that he was engaged in the performance of an act inherently dangerous to others and evincing a wanton disregard for human life. Con-

sequently, when instructing the court-martial on the offense of unpremeditated murder—alleged as in the specification now before us—the law officer must determine whether the evidence adduced at the trial falls within the ambit of Articles 118 (2), 118 (3), or under both. United States v. Holsey, 2 USCMA 554, 10 CMR 52.

In the instant case the law officer appears to have concluded that the evidence fitted both subdivisions of Article 118, for he instructed the court-martial as follows:

"The court is advised that to find the accused guilty of the Specification of the Charge, it must be satisfied . . . : (1) That the victim named is dead; (2) That his death was caused by an unlawful act or omission of the accused, as alleged; (3) That, at the time of the killing, the accused intended to kill or inflict great bodily harm or was engaged in an act inherently dangerous to others and evincing a wanton disregard of human life."

The evidence in the case at bar makes abundantly clear that the accused's acts were directed solely against the deceased, Quinola, and that no other life or limb was placed in jeopardy. In United States v. Davis, 2 USCMA 505, 10 CMR 3, this Court held that:

". . . the conduct within the ban of Article 118 (3) of the Code, supra, is only that which is 'inherently dangerous to others' in that it is directed towards persons in general rather than against a single individual in particular—that is, where the actor has evinced a 'wanton disregard of human life' in the general or multiple sense."

Accordingly, the facts in the instant record cannot support a finding of guilt under Article 118 (3), since only one person was endangered by the accused. The law officer's inclusion of this branch of unpremeditated murder within his instructions was, therefore, erroneous.

IV

It has been suggested, however, that the law officer's error could not possibly have prejudiced the accused. One phase of this argument runs to the effect that, since the law officer's questioned instruction related to conduct "inherently dangerous to *others,*" all members of the court-martial would have concluded that it was without applicability to the facts of the case before them. (Italics supplied.) In short, this reasoning assumes that the members of the court would necessarily have construed "others" in a multiple sense, and as demanding acts which operated to endanger more than one person. This argument is clearly fallacious.

In the first place, the law officer—who presumably would have been as adept in construing his own instructions as would members of the court—must have regarded the instruction under Article 118 (3) as applicable, else he would not have supplied it. The trial counsel also must have believed that Article 118 (3) was applicable to the facts before the tribunal—for he based much of his argument thereon. Whatever might have been their inclination *in vacuo,* the members of the court—we think—could scarcely have failed to follow the guidance furnished by trial personnel in concluding that Article 118 (3) was relevant to the case before them all. Secondly, so far as language is concerned, there is no overwhelming reason why "others" must be considered as applicable only to wanton conduct which endangers more than one person. It is indeed true that in the Davis and Holsey cases, supra, we decided that Article 118 (3) was intended by Congress to apply only to conduct which endangered more than one person. However, the issue was regarded by us as an extremely close one, and respectable civilian authority is to be found on both sides of the question.

Finally, it is obvious that to accept in the instant case the view that the court must have understood that the word "others," as used in the law officer's instructions related to more than one person would be tantamount to a rejection of Davis and Holsey *sub silentio.* In adopting the Government's view we would be asserting, as to a case in which Article 118 (3) is *inapplicable,* that the court in its wisdom would

**265**

have recognized this irrelevance, and thus that the accused could not have been prejudiced by the law officer's instruction that it *was* applicable. It is obvious that this rationale would have been equally germane in Davis and Holsey, and would have obviated the need in those cases to reverse for improper alternative instructions on unpremeditated murder.

V

The second arm of the suggestion that the accused was unprejudiced by the alternative instructions furnished in the instant case centers on the claim that the evidence adduced at the trial overwhelmingly established an intent to kill. It is said that the members of the court must necessarily have convicted because they found an intent to kill, rather than on the theory that the accused was guilty of an unpremeditated murder tailored along the lines of Article 118 (3). Of course, this "mountain-molehill" approach disregards—or, in the alternative, brands as inherently incredible—the accused's sworn testimony that he did not purpose to kill his friend, Quinola. Likewise it dismisses substantial character evidence, which similarly negates an intent to kill or to do great bodily harm to the deceased.

On the other hand, the record reveals that the argument of trial counsel—who heard the evidence, and who presumably and properly was seeking to utilize the approach most beneficial to the Government—relied heavily on the view that he had presented to the court-martial "a clear cut case of an act which is inherently dangerous to others and displaying a wanton disregard for human life." The staff judge advocate to the convening authority seems also to have been unaware that the evidence of intent to kill was of Himalayan proportions. His review comments: "In the instant case, the same record may well have convinced another court that the offense committed was no more than involuntary manslaughter. Nevertheless, the court, rather than the reviewer, is the trier of the facts." In their brief before the board of review, appellate Government counsel maintained that the conduct of the accused, although he may have lacked the intent to kill or wound his victim, "was clearly of an inherently dangerous nature and obviously of such a nature as to indicate a wanton disregard of human life." Of course, this brief preceded our decisions in Davis and Holsey. Now Government counsel have nimbly changed partners, and contend that guilt under Article 118 (3) was so clearly *not* raised by the evidence that the instruction concerning it related only to a "molehill" of evidence, which the members of the court unquestionably would have disregarded.

To the experienced lawyers who dealt in one way or another with the instant case at various earlier stages in its history, the evidence of intent to kill or to do grievous bodily harm must have seemed a much smaller "mountain," and the evidence of criminal liability under Article 118 (3) a much larger "molehill," than is now suggested was the fact. We see no reason to believe that the members of the court were any the less prone to conclude that Article 118 (3) was applicable to the evidence presented. Of course—and subsequent to the trial of the accused—our opinions in Davis and Holsey made explicit that a conviction may not lawfully be rendered under Article 118 (3) in a setting in which only one person was endangered by a culprit's wanton conduct. However, many able lawyers—and among them apparently the law officer who heard the instant case—did not consider that Article 118 (3) was limited in this manner prior to the rendition of these decisions. It would be unrealistic to assume that the members of the court-martial were more prescient than these, and that they declined to consider, in reaching their finding, the alternative of unpremeditated murder under Article 118 (3), which the law officer had expressly placed before them. Under the circumstances we must conclude that prejudice to the accused resulted from the law officer's erroneous instructions.

It follows from what has been said that the decision of the board of review must be reversed and a rehearing directed.

Judge LATIMER concurs.

266

QUINN, Chief Judge (dissenting):

I dissent.

It is clear that the actions of the accused were directed solely against the victim and did not endanger the lives of others. Under the circumstances, the indiscriminate inclusion of the elements of both types of unpremeditated murder within the framework of the instructions was wrong. United States v. Davis, 2 USCMA 505, 10 CMR 3; United States v. Holsey, 2 USCMA 554, 10 CMR 52.

It does not follow, however, that the findings and the sentence should be set aside. Under Article 59, Uniform Code of Military Justice, 50 USC § 646, we should not reverse unless the error materially prejudiced the substantial rights of the accused. See United States v. Goodson, 1 USCMA 298, 3 CMR 32; United States v. Hopf, 1 USCMA 584, 5 CMR 12; United States v. Kubel, 1 USCMA 645, 5 CMR 73; United States v. Jenkins, 1 USCMA 329, 3 CMR 63. Here, the defective instructions would prejudice the accused only if the evidence indicated a reasonable probability that the court would base its findings upon the theory that the accused was engaged in an act inherently dangerous to others, evincing a wanton disregard for human life. United States v. Davis, supra; United States v. Holsey, supra.

After careful consideration of the evidence, I find no such probability in this case. Indeed, I can discover no reasonable possibility of it. Reduced to its essentials, the evidence establishes that the accused, angered by his paramour's actions and doubtlessly suspicious of her behavior, armed himself with a lethal instrument, and awaited her return. Immediately upon the appearance of Quinola, the victim, the accused shot and killed him. The facts so clearly indicate an intent to kill that every other rational hypothesis is excluded. See United States v. Black, 3 USCMA 57, 11 CMR 57. The only evidence to the contrary is the bare assertion of the accused that the weapon was accidentally discharged when he aimed it at Quinola to repel an assault by the latter. This is a palpable fabrication. It is inconsistent with his original statement of the reason which prompted him to procure the weapon in the first place, namely, "because [he] was mad about the whole situation." Realizing that this supplied a motive for the slaying, he changed his story at the trial and asserted that he had armed himself against the possibility of encountering thieves.

The physical facts of the case completely belie the accuracy of the accused's assertion that the weapon was accidentally discharged. The shooting occurred in a room ten feet wide. When Quinola first entered, the participants were separated by only six feet. Had Quinola launched an assault upon the accused under these circumstances it would obviously be impossible for the latter to reach under a pillow, seize a pistol, load, and aim it before Quinola was upon him. The glaring inconsistencies and inherent improbabilities require the rejection of this exculpatory portion of his testimony and destroy it as the basis of a finding. See United States v. Ginn, 1 USCMA 453, 4 CMR 45. To arrive at a finding of guilt predicated upon any theory other than an intent to kill or inflict great bodily harm, the court-martial would have to reject the only reasonable view of the evidence and accept instead an obviously false statement. It is extremely difficult to believe that the court in this instance either did so, or could have done so. Therefore, I conclude that it was not misled by the instructions. Consequently, the accused was not prejudiced. United States v. Jenkins, supra; United States v. Moynihan, 1 USCMA 333, 3 CMR 67; United States v. Boone, 1 USCMA 381, 3 CMR 115; United States v. Cook, 1 USCMA 421, 4 CMR 13; United States v. Shepard, 1 USCMA 487, 4 CMR 79. I would affirm the decision of the board of review.