UNITED STATES, Appellee

v

EARL A. WEEKS, Private First Class,
U. S. Army, Appellant

15 USCMA 583, 36 CMR 81

No. 18,797

January 21, 1966

*First Lieutenant Melvin K. Najarian* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Jacob Hagopian, Lieutenant Colonel Martin S. Drucker,* and *Captain J. Philip Johnson.*

*Captain Michael E. Phenner* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Francis M. Cooper* and *Captain Samuel D. Engle, Jr.*

## Opinion of the Court

FERGUSON, Judge:

On a rehearing of his case before a general court-martial, convened at Fort Leavenworth, Kansas, by the Commanding General, Fifth United States Army, the accused was found guilty of conspiracy to commit larceny, wrongful sale of Government property, and larceny, in violation of Uniform Code of Military Justice, Articles 81, 108, and 121, 10 USC §§ 881, 908, 921, respectively. He was sentenced to bad-conduct discharge, forfeiture of all pay and allowances, and confinement at hard labor for two years. With some immaterial modifications in the

findings, the convening authority approved the sentence. The board of review affirmed, and we granted accused's petition for review upon three issues which will hereinafter be discussed.

## I

During the night of July 6–7, 1962, Sergeant Carl L. Coons was serving as Charge of Quarters in the barracks of Company E, 2d Battle Group, 28th Infantry, then stationed at Munich, Germany. As such, he had possession of the keys to the company arms room, the door to which was secured with two padlocks, and within which were stored all company weapons, further protected by locked racks.

On the morning of July 7, 1962, Corporal Michael Kiselvach, the company armorer, found, on reporting for duty, that the locks on the arms room door had been cut off and left lying on the floor. When he entered the room, he discovered that other locks on some of the weapon storage facilities had been removed in like manner. An inventory disclosed that a rifle, a machine gun, and a grenade launcher were missing. Keys to the arms room were normally left with the Charge of Quarters. The balance of the prosecution's case depends upon the testimony of Sergeant Coons, who conceded such to be the fourth version of the incident he had given under oath, the former three allegedly being false.

Coons, now a civilian, declared the accused approached him "approximately a month before, . . . and mentioned that he may possibly be able to sell some weapons if we could get them, some equipment and weapons." On July 2d, accused informed Coons "he definitely could or he had found somebody that would buy weapons or equipment." Coons indicated he could probably obtain the items and later told Weeks he was to be Charge of Quarters on July 6th, "and it would be possible for me to get the weapons easier." The theft was then planned by the two men.

Weeks was to borrow Coons' car for use during a three-day pass which he had previously been authorized. On the evening in question, he was to park it under a designated window of the barracks, go to the Enlisted Men's Club, and telephone Coons, informing him it was there. "I was to steal the weapons and put them in the car and let him know and he would take the weapons from there."

According to Coons, accused parked the car at the designated place and telephoned him to that effect. Coons informed his assistant Charge of Quarters that he was going to the Enlisted Men's Club. Instead, he proceeded, with the proper keys, to the arms room, removed the locks from the door and took them to the Club. There, he and the accused cut the locks with a pair of bolt cutters. Returning alone to the barracks with the cutters, Coons entered the arms room, cut locks on a rifle rack and machine gun cabinet, and removed one each of these weapons. On his own impetus, he added a grenade launcher from a nearby chest, and took all the items to his parked car, storing them in the trunk.

Returning to his "CQ desk," Coons, in the presence of his assistant, telephoned the accused, who had remained at the Club, and told him "everything was all right and he could take the car." As he watched from a window, Weeks got into the vehicle and drove it away.

On July 9th, accused returned the car to Coons. The latter examined it and found the trunk empty. Accused told him "they had disposed of the weapons the day before, Sunday, . . . and that they hadn't gotten the money, hadn't gotten paid yet for the weapons, so he didn't give me any money at this time." Shortly thereafter, Coons alleged he again sought his share of the proceeds, and Weeks repeated he had not yet been paid, but would lend him 400 marks from his personal funds and deduct the sum from the amount eventually realized on the sale of the weapons. After receiving this amount, Coons on the next day obtained a further advance of 300 marks. Still later, accused told him "he had received a portion" of the sales price, but "it was a lot less than we agreed upon."

**585**

In December 1962, "during our Article 32 investigation," and while in the stockade, Coons saw "a man identified . . . as Nikolaus Lazopoulas," and "Weeks told me that was the man who bought the weapons."

On cross-examination, Coons admitted that, on July 18, 1962, he denied under oath he was in anyway implicated in the theft or had any knowledge of the matter. He further admitted that, on October 3, and October 17, 1962, he had twice similarly averred he had possession of the bolt cutters upon first going to the arms room to cut the locks and that he had previously sworn he had not used a key to gain entrance. Coons further conceded that, in such statements, he made no mention of removing the locks, taking them to the Club, and, with accused's assistance, cutting them with the bolt cutters.

Coons also declared he had been convicted of larceny upon his plea of guilty for his participation in the offenses, had testified against accused and others in the interim, had received a reduction in his sentence, and had been granted general immunity by the officer exercising general court-martial jurisdiction over him "as to any offenses that might arise," except false swearing.

For the defense, it was stipulated Coons' former First Sergeant regarded his reputation for truth and honesty as "no good" and he would not believe him under oath.

Mr. Joseph Taormina testified that, while in confinement with Coons and Weeks at Dachau, Germany, and again at Fort Leavenworth, Coons told him "he lied [in the Weeks' trial] so he could get off easy and he said something about he had a deal made so that he would get a cut, or just a year and back to duty." Coons also told him "he would lie, he would inform, he would do practically anything to get off light or have it made easier for him."

Staff Sergeant James F. Nix, a supervisor at the Disciplinary Barracks, opined that Coons had "very little" character for truth and veracity and

**586**

that he would not believe him under oath.

The accused, testifying in his own behalf, denied any knowledge or participation in the offense. Admitting he knew Sergeant Coons, and had had dealings with him in the past, he declared that he had borrowed Coons' car on the weekend in question and spent his time with his fiancée in Munich. He believed "Coons is using me as a convenient person, . . . to get a cut in his sentence" and to shield one of his friends, who operated the Enlisted Men's Club.

In rebuttal, and over objection by defense counsel, the prosecution was permitted to prove a conviction of Mr. Taormina for maiming. Taormina was not recalled to the stand, and the matter had not been mentioned on his cross-examination.

Sergeant First Class Inkman, also a supervisor at the Disciplinary Barracks, testified Taormina's reputation for truthfulness and honesty "is sorry" and he would not believe him under oath.

First Sergeant Robert G. Tuttle, a member of the Disciplinary Barracks staff, opined that Coons' reputation for truthfulness and honesty was good and he would believe him under oath.

Such concluded the evidence presented to the members of the court-martial.

II

The first issue before us inquires whether the evidence is sufficient to establish a *corpus delicti* ■ for receipt of accused's admissions to Coons concerning the wrongful disposition of the allegedly stolen weapons. As noted above, that proof consists of Coons' testimony that accused approached him concerning the theft of weapons for the purpose of selling them; Coons stealing them under the outlined circumstances and placing them in his car; the accused driving the car away; his return of the vehicle, in which the weapons were no longer present; and his advances of

two sums of money to Coons a few days later.

The applicable law is not in dispute. As we said in United States v Young, 12 USCMA 211, 30 CMR 211, at page 213:

"It is settled military law that, in order to sustain findings of guilty, an accused's confession must be corroborated by substantial, independent evidence tending to establish the existence of each element of the offense charged."

Again, in United States v Smith, 13 USCMA 105, 32 CMR 105, Judge Kilday, joining in the foregoing statement, declared, at page 112:

"It is this writer's view that the rule that no person shall be convicted of crime upon his confession unless and until the same is corroborated is a sound principle of law; it is a valuable right of the accused and a great protection to him. Proof of the *corpus delicti* is fundamental in every criminal prosecution, and its existence must be shown, just as all other elements; that is, by legal and competent evidence."

See also United States v Isenberg, 2 USCMA 349, 8 CMR 149; United States v Villasenor, 6 USCMA 3, 19 CMR 129; United States v Anderson, 14 USCMA 627, 34 CMR 407; and United States v Cook, 15 USCMA 436, 35 CMR 408.

The Government does not contend the law regarding *corpus delicti* is otherwise, but urges it is not here applicable as the accused's admissions were made as a part of the sales transaction, hence, were contemporaneous with the crime, and were, therefore, admissible without corroboration. See United States v Villasenor, supra. Under the evidence detailed in this record, that argument is not persuasive, for there is nothing to show whether the accused's alleged declarations were, in fact, made before, during, or after the consummation of the offense. Indeed, the sole witness on the entire transaction seemed to be of a view opposite to that which the Government now urges, for he believed the sale was completed when he talked to the accused, that the latter cheated him out of his "fair" share of the proceeds, and, accordingly, sold a car registered in his name, but belonging to the accused, in order to make up the supposed deficit.

Be that as it may, the record lacks proof the accused's statements were contemporaneous with the ▮ crime and were thus admissible, though uncorroborated. United States v Villasenor, supra. The problem remaining, then, is whether the other circumstances shown amount to "substantial, independent evidence tending to establish the existence of each element of the offense charged." United States v Young, supra, at page 213. As Judge Latimer so cogently remarked in United States v Isenberg, supra, at page 351, it is the "weight of this independent evidence . . . [which] has posed the problem."

The Government urges the theft and transportation of the stolen goods, pursuant to earlier agreement between Coons and the accused, and the receipt by Coons of the later "advances" from the accused, indicate the probable wrongful disposition of the weapons by means of their sale. We think not, and suspect the prosecution's advocates view the proof through hindsighted spectacles tinted with evidence not received at the trial.

In order to receive the admissions and establish the accused's guilt, there must be *substantial, inde-* ▮ *pendent* proof of wrongful disposition by sale. United States v Isenberg; United States v Young; United States v Smith, all supra. That is simply lacking in this record. A concerted agreement to steal, the actual theft, and the transportation of the stolen items are all demonstrated, as well as loans thereafter made to Coons by the accused. But it is no more than speculation to say that, on the basis of such facts, an actual sale has probably been made out. The transcript does not reflect whether the stolen items were recovered or, if so, from whom. So far

as the record shows, the accused may have retained the weapons, been unable to complete the sale, or have concealed them, once the investigation began. On the state of the proof, we simply are unable to declare he probably disposed of them by sale and, in consequence, find the accused's post-criminal admissions to Coons were, as trial defense counsel contended, insufficiently corroborated to permit their reception in evidence. United States v Smith, supra. United States v Isenberg, supra.[1]

### III

The second issue before the Court inquires into the propriety of the Government's impeaching the credibility of the defense witness, Taormina, by proof of a prior conviction for maiming in rebuttal to the defense case without first inquiring concerning such matter on Taormina's cross-examination. We find such procedure free from error.

The Manual for Courts-Martial, United States, 1951, in laying down rules of evidence for courts-martial—which, unless inconsistent with the Code, have the force and effect of law, see United States v Smith, supra—provides pertinently as follows:

"(b) *Conviction of crime.*—A witness may be impeached by showing that he has been convicted by a civil or military court of a crime which involves moral turpitude or is such as otherwise to affect his credibility. *Proof of such conviction may be made by the original or an admissible copy of the record thereof, or by an admissible copy of the order promulgating the result of trial. Before introducing such proof, the witness may first be questioned with reference to the conviction sought to be shown. If the witness admits the conviction, other proof is unnecessary.*" [Emphasis supplied.] [Manual, supra, paragraph 153b (2) (b).]

The rules of evidence promulgated under the amended Articles of War in the Manual for Courts-Martial, U. S. Army, 1949, provided that, as a predicate for the receipt of evidence of a witness' previous conviction, "the witness *must first be questioned* with reference to the conviction sought to be shown" (emphasis supplied); Manual, 1949, supra, paragraph 139b. Upon publication of the new rules under the Manual for Courts-Martial, United States, 1951, the word *"must"* was changed to *"may"* and the present provision explained by its drafters as follows:

"*Conviction of crime.*—It has here been stated that before introducing proof of a conviction of a crime affecting his credibility, the witness *may* first be questioned with reference to the conviction sought to be shown. The requirement in paragraph 139b, page 186, of the 1949 Manual that the witness *must* first be questioned with respect to the conviction does not appear to be good law (Wigmore, § 980, Note 5). No such requirement had been set forth in the discussion of this question in section 301, NC & B." [Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 242.]

In United States v Moore, 5 USCMA 687, 18 CMR 311, we stated, on the same subject, at page 698:

". . . The wording of paragraph 153b (2), the corresponding section of the current Manual, has been rephrased—*and it seems that the object of the alteration was to delete the requirement that a witness be questioned with respect to a previous conviction as a predicate for the introduction of extrinsic evidence of it.* See Legal and Legislative Basis, Manual for Courts-Martial, United States, 1951, page 242." [Emphasis supplied.]

---

[1] Fairness to the prosecution dictates our notation that it duly summonsed one Roumanis, a former soldier, who was alleged to have played a prominent part in these events. Roumanis, however, failed to appear. Rather than delay the trial by attachment of his person, the Government elected to proceed. Unfortunately, it did so at the risk of failing to prove its case.

While we may have doubts concerning whether it is better practice separately to introduce the witness' conviction of crime without first inquiring of him on cross-examination concerning its existence, there can be no argument that the adoption of such a rule of evidence is within the discretion of the President, and, as such, is binding on this Court and all lesser military judicial bodies. Code, supra, Article 36, 10 USC § 836; United States v Smith, supra. Indeed, it was the common-law rule that "a written copy, and not oral recollection [of the conviction], was the only proper mode" of proof. Wigmore, Evidence, 3d ed, § 980. And "the rule about asking the witness before proving a self-contradiction . . . has no application." *Id.*, footnote 5, at page 544.

Thus, in the Federal courts, a previous conviction may now be shown either by cross-examination of the witness or by proof of a record of conviction. Williams v United States, 3 F2d 129 (CA8th Cir) (1924). Earlier authorities denied the right so to cross-examine a witness, and, in fact, limited proof of conviction to record evidence thereof. It now suffices, however, either by statute or by judicial decision, in most jurisdictions, that either method of proof may be used. See generally, 58 Am Jur, Witnesses, §§ 747, 748; Annotations, 41 ALR 337, 28 ALR2d 1115, 1132; and Slater v United States, 1 Okla Crim 275, 98 Pac 110 (1908). The Manual, supra, therefore, does no more than adopt the rule normally applied elsewhere, including the Federal courts. It governs the question before us, and we accordingly find no error in the practice here pursued by the Government. United States v Moore, supra; Williams v United States, supra.

### IV

The final issue before us inquires into the propriety of the law officer's instructions regarding the weight and credibility to be accorded the testimony of Coons, as an alleged accomplice of the accused. In its entirety, the advice is as follows:

"The testimony of an accomplice insofar as it is uncorroborated, is of doubtful integrity and should be treated with great caution. You are advised that the testimony of the witness Coons is in contemplation of law considered as being that of an accomplice. As to the alleged entry into the arms room and the taking of weapons, for instance, you may, in view of the stipulated testimony of other witnesses, consider that this chief prosecution witness's [sic] testimony is corroborated; *but on the other hand, you may not consider that his testimony as to the accused's implication in the alleged offense is corroborated. Accordingly, you should carefully scrutinize the testimony of this alleged accomplice with regard to the accused's implication, if any, as a principal in the alleged commission of these offenses by him, and in the light of all of the circumstances shown—no, and in this connection, you should consider whether in the light of all of the circumstances shown, Coons' testimony is self-contradictory, uncertain, or improbable.* If you do consider that insofar as his testimony implicates and identifies the accused as the perpetrator of any offense charged, keeping in mind now my instructions as to aiding, abetting, conspiring, or procuring, his testimony—if you do consider that in that respect his testimony is self-contradictory, uncertain, or improbable, you should acquit the accused, since he may not be convicted unless you are convinced beyond a reasonable doubt that the accused has been identified as an individual criminally responsible as a principal. *In other words, what I am saying here is that insofar as the testimony of Coons puts the finger upon the accused as being the person implicated with him in the commission of these offenses, you may consider when you look at all of the evidence in the case, that that testimony is not corroborated; and, if you make such conclusion, and if you consider that his testimony not corroborated, is self-contradictory, uncertain, or improbable, then you may*

**589**

*not convict the accused, since identity of the accused as a perpetrator or one criminally liable for an offense, must be proved beyond a reasonable doubt by the prosecution.* On the other hand, if you consider that his testimony implicating the accused was not self-contradictory, uncertain, or improbable, you may accord such credibility to his testimony as you deem appropriate in the light of your common experience and knowledge and all the evidence in the case." [Emphasis supplied.]

Briefly stated, the contention is that the emphasized portion of the instruction left it open to the court-martial to find Coons' testimony implicating the accused corroborated by other evidence in the case, when in fact there was no such corroboration. The Government, however, contends the instructions as a whole made the contrary proposition clear to the court members, *i.e.*, that there was no corroboration of the prosecution's witness in this respect. We agree.

First, the law officer made it clear to the court members that Coons' testimony was that of an ac- █ complice and, as such, "is of doubtful integrity and should be treated with great caution." There can be no argument with the validity of such advice. See United States v Scoles, 14 USCMA 14, 33 CMR 226, and United States v Bey, 4 USCMA 665, 16 CMR 259. He then informed the court that, in accordance with certain stipulated evidence, it could find Coons' testimony corroborated as to the actual entry in the arms room and theft of the weapons. Again, the law officer accurately depicted the testimony. He immediately followed with the statement that "on the other hand, you *may not consider that his testimony as to the accused's implication in the alleged offense is corroborated.*" (Emphasis supplied.) Thus, he expressly and accurately informed the members that, insofar as the identification of the accused was concerned, the case against him stood or fell on Coons' uncorroborated word.

The law officer followed this statement up at length with the admonition

to "carefully scrutinize the testimony of this alleged accomplice with regard to the accused's implication, if any," and consider "whether in the light of all of the circumstances shown, Coon's testimony is self-contradictory, uncertain, or improbable." If such was found to be the case, he told the court it "should acquit the accused, *since he may not be convicted unless you are convinced beyond a reasonable doubt that the accused has been identified as an individual criminally responsible as a principal.*" (Emphasis supplied.) Again, the law officer accurately pointed to the proper standard for measuring the accomplice's credibility. United States v Winborn, 14 USCMA 277, 34 CMR 57; cf. United States v Allums, 5 USCMA 435, 18 CMR 59.

It was in this framework that the law officer came to the allegedly improper language and advised the court, "In other words, . . . *you may consider* when you look at all of the evidence in the case, that that testimony *is not corroborated.*" (Emphasis supplied.) But this is merely a repetition of what he had before stated; he did not, as is contended, imply to the fact finders that, upon looking at all the evidence, they could find corroboration for Coons' implication of the accused. Quite the contrary, he told them shortly, as he had said before, "you may consider . . . *that that testimony is not corroborated.*" (Emphasis supplied.) Such did not leave the members free to find corroboration. It plainly told them that, insofar as the accused's implication was concerned, Coons' testimony stood alone, as he had before said to them, and that conviction could not follow unless they found such uncorroborated testimony not to be self-contradictory, uncertain, or improbable. In short, there is no difference between saying "may consider . . . that that testimony is *not* corroborated" and declaring, as he had before, that "you may *not* consider . . . his testimony . . . is corroborated." (Emphasis supplied.) Taken in context, the instructions properly and repeatedly advised the court members

of the standards which were to be utilized in measuring Coons' credibility. United States v Winborn, supra. As such, they were appropriately tailored to the evidence and lack thereof, leaving to the fact finders their proper role of using such principles in determining accused's guilt. The advice, accordingly, was not erroneous.

### V

In sum, then, we find the evidence here legally insufficient to establish the requisite *corpus delicti* for the charged sale of Government property. The findings of guilty with respect to that offense must, therefore, be set aside. We find, however, no error as to the proof by the Government of the witness' previous conviction and no infirmity in the law officer's instructions. Accordingly, the other findings of guilty may be affirmed, although reassessment of the sentence is necessitated.

The findings of guilty of Additional Charge III and its specification are set aside and ordered dismissed. The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The board may reassess the sentence on the basis of the remaining findings of guilty.

Chief Judge QUINN and Judge KILDAY concur.