UNITED STATES, Appellee

v

JOSEPH R. HARTLEY, Private First Class,
U. S. Army, Appellant

16 USCMA 249, 36 CMR 405

250

*First Lieutenant Kenneth J. Stuart* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk, Lieutenant Colonel Martin S. Drucker,* and *Captain Philip L. Robins.*

*Captain Joseph H. Crosby* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

KILDAY, Judge:

The appellant was arraigned before a general court-martial convened at Fort Eustis, Virginia, on one charge and specification of premeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918. He pleaded not guilty. In his instructions before findings, the law officer submitted the offenses of premeditated murder; unpremeditated murder, as defined by Article 118(2), Uniform Code of Military Justice, supra; murder while engaged in an act inherently dangerous to others, as defined in Article 118(3), supra; involuntary manslaughter; and negligent homicide. He also instructed on excusable homicide by accident or misadventure.

The court-martial convicted the appellant of unpremeditated murder, in violation of Article 118(3), supra. He was sentenced to dishonorable discharge, confinement at hard labor for eight years, total forfeitures, and reduction to the grade of Private E–1. The convening authority approved the sentence. A board of review in the office of The Judge Advocate General of the Army affirmed the findings and sentence. We granted review on three issues assigned by the appellant and one issue specified by us. These issues will be hereinafter stated.

In the early evening preceding this tragedy the appellant, PFC Lynn, PFC Bishop, PFC Coon (the deceased), and apparently a fifth soldier, agreed to have a party in the barracks. Lynn and Bishop went to a package store and secured two fifths of liquor. Upon their return, the five soldiers proceeded to a room on the second floor of the barracks and consumed the liquor. There was no equal consumption of the liquor. Bishop apparently consumed more than the others and later became intoxicated. Lynn appeared to have been intoxicated to a degree. The autopsy confirmed that Coon, the deceased, was borderline. Appellant was not intoxicated, but did consume a portion of the liquor. After having disposed of the two fifths of liquor, the five participants agreed to go to a night club or bar off base. Before leaving the barracks, appellant loaded a .22 calibre Derringer pistol which he carried. Appellant is right-handed, but his right hand was enclosed in a cast extending from just below his elbow to his fingers. He placed the pistol in his left-hand jacket pocket.

The party remained for a time at the night club and drank but a beer or two. Bishop stated he was ill and desired to return to the barracks. Thereupon, Lynn, Bishop, Coon, and the appellant, went to the third floor bay of their barracks. Bishop was sufficiently drunk to require physical assistance to get upstairs. In the bay, Bishop and Lynn engaged for a few seconds in a ruckus which was broken up by the appellant, Coon, and others. An exchange of words between Bishop and Lynn, concerning Bishop's throwing a cigarette at Lynn, then brought about the beginnings of another fight. At this point the appellant, with his

**251**

left hand in the pocket of the jacket which he was wearing said, " 'I'm tired of this stuff, no more fighting.' " " 'If there's going to be any more fighting, you will have to fight me, and the first man hits me, I'll kill him.' " The appellant had the loaded .22 Derringer in his left jacket pocket. Then, the appellant stepped between the two quarreling men and tried to separate them. His left hand was still in his jacket pocket. After the appellant moved between the two men, according to the appellant's own testimony, Lynn then stated to Bishop, " 'If you hit me I will cut you.' " At this time the appellant cocked his pistol. As a result of either the appellant's pushing Lynn too hard, or of their tripping over an electric buffer, Lynn fell backwards with the appellant "more or less on top of him." As the appellant was getting up, Coon grabbed him around the back, or left rear, and they wrestled. The appellant turned around and faced Coon, still keeping his left hand in his jacket pocket. Coon got a "bear hug" on the appellant and as they struggled, the appellant said, " 'Let go, let go, Coon,' " and " 'Watch out.' " Finally, the appellant worked himself loose for a few seconds, fell against a wall, and then a shot went off. When the weapon fired Coon fell with a hole in his throat. The appellant then fled and ultimately turned himself in the next day to civilian police. Coon died from the gunshot wound. At the time of the homicide, in addition to the four constituting the party, other soldiers numbering ten to twenty were in the barracks bay.

## I

The first assigned issue challenges the sufficiency of the evidence to establish unpremeditated murder by the commission of an inherently dangerous act. The second assigned issue contends that murder, as defined by Article 118(3), Uniform Code of Military Justice, 10 USC § 918, was not reasonably raised by the evidence and, therefore, the law officer erred in instructing the court-martial, over objection of defense counsel, on that offense. The two issues are very closely related and both require an analysis of the evidence. We consider them together.

Article 118, Uniform Code of Military Justice, supra, provides:

"Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he— . . .

"(3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; . . .

is guilty of murder. . . ."

We have heretofore had occasion to consider the type of murder thus defined. United States v Davis, 2 USCMA 505, 10 CMR 3; United States v Holsey, 2 USCMA 554, 10 CMR 52; United States v Sandoval, 4 USCMA 61, 15 CMR 61; United States v Dacanay, 4 USCMA 263, 15 CMR 263; United States v Stokes, 6 USCMA 65, 19 CMR 191; United States v Judd, 10 USCMA 113, 27 CMR 187; United States v Cook, 12 USCMA 173, 30 CMR 173. Also, see Wechsler and Michael, "A Rationale of the Law of Homicide," 37 Columbia Law Review 701, et seq. (1937); Note, "The Negligent Murder," 28 Kentucky Law Journal 53 (1939); Note, "Homicide—Is Knowledge of Danger Necessary in Murder by a Dangerous Act?" 28 Kentucky Law Journal 474, et seq. (1940); Perkins, Criminal Law, page 61 (1957).

The appellant argues, essentially, that previous cases in which we have sustained convictions of murder under Article 118(3), Uniform Code of Military Justice, supra, are distinguishable from the instant case in which, instead of showing a depraved and malignant heart, the appellant was actually taking steps to avoid harm to others. Referring to various portions of the evidence, appellate counsel conclude that all of the appellant's actions were aimed at making peace and preventing violence or serious injury. Appellant also argues that when the pistol was fired in the instant case, only one person, the deceased, was placed in danger.

As to whether murder under Article

118(3) of the Code was reasonably raised by the evidence, appellant argues that the record of trial is devoid of any evidence showing that appellant had a depraved and malignant heart; that the evidence indicates an absence of knowing and deliberate intentional conduct resulting in the homicide; and, thirdly, the act must be inherently dangerous to the lives of more than one person, and that when the shot was fired only one person was placed in danger.

In United States v Sandoval, 4 USCMA 61, 66, 15 CMR 61, we said:

"It is generally held that a conviction for murder may be predicated upon reckless, wanton and inherently dangerous acts which place the lives of other persons in danger."

In that case, we quoted with approval the following language in Banks v State, 85 Texas Crim 165, 211 SW 217:

"'One who deliberately uses a deadly weapon in such reckless manner as to evince a heart regardless of social duty and fatally bent on mischief, as is shown by firing into a moving railroad train upon which human beings necessarily are, cannot shield himself from the consequences of his acts by disclaiming malice. Malice may be toward a group of persons as well as toward an individual. It may exist without former grudges or antecedent menaces. The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice.'" [United States v Sandoval, supra, at page 66.]

Engaging in an act inherently dangerous to others, without any intent to cause the death of, or great bodily harm to, any particular person, or *even with a wish that death may not be caused,* may also constitute murder if the performance of the act shows a wanton disregard of human life.

Murder under this article of the Code is predicated on a wanton disregard of human life in general and not solely against a particular individual. United States v Davis, 2 USCMA 505, 10 CMR 3; United States v Holsey, 2 USCMA 554, 10 CMR 52.

As we have previously stated, the record reveals that the appellant, immediately prior to leaving the barracks for a social evening with a party of friends at a night club off base, deliberately loaded his pistol. He is right-handed but his right hand was in a cast. He placed the pistol in his left-hand jacket pocket. After returning to the barracks, he entered a bay in which from ten to twenty other soldiers were present. A ruckus developed between Bishop and Lynn, one of whom he knew to be drunk and the other, as least, drinking to excess. With others, he succeeded in terminating it. When the quarrel renewed, appellant stated, " 'I'm tired of this stuff, no more fighting.' " " 'If there's going to be any more fighting, you will have to fight me, and the first man hits me, I'll kill him.' " During this time appellant deliberately had his left hand in the left-hand pocket of his jacket, where he carried his loaded pistol. He deliberately stepped between two quarreling men. At about this juncture, the appellant deliberately cocked the loaded pistol and kept his hand in the pocket where it was located.

During the continuing struggle, appellant and Lynn fell backwards with appellant partially on top of him. As appellant was getting up, the deceased grabbed him around the back or left rear and the two wrestled with the appellant turning around and facing the deceased. Deceased hugged appellant as they struggled and appellant said " 'Let go, let go, Coon,' " and " 'Watch out.' " Appellant worked himself free, fell against the wall, and a shot was fired. Appellant was not touching deceased at the time the shot was fired. Coon's hands were approximately even with his shoulder blades. When the shot was fired, the appellant had his hand in the jacket pocket. He had raised his left hand, containing the loaded, cocked pistol and was holding his hand, in the jacket pocket, shoulder high about a foot

**253**

in front of himself. When the shot was fired the deceased fell to the floor with a bullet hole in his throat. Thereupon Lynn hollered, " 'What happened, what did you do to him?' " Someone shouted, " 'He shot Coon, he shot Coon.' " The appellant replied, " 'Yes, I shot him but I didn't mean to do it; he knows I didn't mean to do it.' " Lynn began to run toward deceased and appellant said, " 'Don't move, I'll shoot you.' " Turning to the assemblage appellant said, " 'I got one more bullet left. Who wants to be a dead hero?' " The appellant fled the base and next day surrendered himself to civilian police.

In his testimony, appellant denied he had intentionally pulled the trigger. He admitted that when the pistol was fired he had his hand in his jacket pocket and had hold of the pistol by the butt and not the trigger. There was no trigger guard on the Derringer pistol. There was expert testimony the pistol did not have a hair trigger; that it would have been necessary for the weapon to be dropped from a height of ten or fifteen feet to cause it to be discharged accidentally; and that the pistol had a five and one-quarter pound trigger pull and was considered to be safe. The evidence was sufficient to have justified the court-martial in finding that the pistol was intentionally fired. As we shall hereinafter point out there is evidence sufficient to justify the court-martial in finding other deliberate acts on the part of appellant.

What we said in United States v McDonald, 4 USCMA 130, 133, 15 CMR 130, is pertinent here:

". . . During the struggle, occasioned solely by the accused's actions, the accused fired the weapon three times, killing Brown. There can be no doubt that the accused intended to fire the pistol, otherwise he would not have drawn back the slide during the course of his struggles. If he discharged the weapon without intending to kill or injure Brown, as he contended, then he did so for another reason undisclosed by the evidence. Firing a pistol under these circumstances

certainly was an act inherently dangerous to every soldier in the close confines of that tent as well as to those in the immediate vicinity. In addition, this act evinced a wanton disregard of human life in general as distinguished from wanton disregard for the life of one particular person. The fact that the particular person, toward whom, under one view of the evidence, all his acts were directed, was killed is immaterial."

It is manifest from this record that the evidence is sufficient in law to establish unpremeditated murder by the commission of an inherently dangerous act. Necessarily, therefore, the evidence reasonably raised the issue of homicide, in violation of Article 118(3), Uniform Code of Military Justice, supra.

## II

The third assignment of error contends that the law officer failed to explain to the court-martial the difference between unpremeditated murder while engaging in an inherently dangerous act and involuntary manslaughter; and erred in failing to tailor either instruction to the facts of the case.

In his instructions, the law officer carefully informed the court-martial of the wide choices it had in passing upon the conduct of appellant. The instructions ranged through premeditated murder, unpremeditated murder in the performance of an inherently dangerous act, involuntary manslaughter, negligent homicide, and excusable homicide by reason of accident or misadventure. Thus, all lesser included offenses and the affirmative defenses were submitted.

In connection with the two types of unpremeditated murder, under Article 118(2) and (3) of the Code, supra, the law officer informed the court-martial:

"The two lesser included offenses of unpremeditated murder and killing while engaged in an inherently dangerous act have in common the element of a malicious intent. In the former, unpremeditated murder,

the malice required is the intent to kill or inflict grievous bodily harm on a particular person. In the latter, killing while engaged in an inherently dangerous act, the malice required *is the intentional doing of the act which caused death* and which is inherently dangerous to others and evinces a wanton disregard for the lives of others. The act in this case, this latter case, need not be intended to result in death or serious bodily harm, but must be the directing of an inherently dangerous force in such a manner and under such circumstances as to knowingly hazard the lives of others in the general or multiple sense." [Emphasis supplied.]

In contrast, in defining the offense of involuntary manslaughter, the law officer stated:

". . . The court is advised that involuntary manslaughter is defined as unlawfully *causing the death of another by culpable negligence.*" [Emphasis supplied.]

He properly defined simple negligence, followed by:

". . . However, culpable negligence—which is required to convict of involuntary manslaughter—is more than simple negligence. It is a negligent act or omission accompanied by a culpable disregard for the foreseeable consequences to others of such act or omission. It is a gross, reckless, deliberate or wanton disregard for the safety of others."

Appellant now complains of the inclusion of the word "wanton" within this instruction. Considering the instructions as a whole, which we must do, United States v Weeks, 15 USCMA 583, 36 CMR 81, we find no reasonable possibility that the inclusion of that word in anywise misled or confused the court in distinguishing between the two offenses. Especially is this true in view of our recent decision in a case involving involuntary manslaughter, United States v Madison, 14 USCMA 655, 34 CMR 435. In the absence of any objection by qualified defense counsel, we would hardly be justified in reversing this conviction upon the inclusion of this one word, in the disjunctive, in an otherwise adequate instruction. We believe that from the manner in which the law officer instructed on the various offenses involved, the elements of each and the distinctions between them, in the absence of any request for further elaboration, and in the light of the evidence in the record, the instructions were adequately tailored to the facts of the case.

### III

The fourth assignment of error reads as follows:

"Whether the law officer erred in not instructing, as requested and agreed, that for Article 118(3) murder the court-martial must find that the accused 'knowingly and deliberately intended to pull the trigger' (R. 134)."

At an out-of-court hearing on the instructions, defense counsel presented the following requested instruction:

" '. . . unless you find beyond a reasonable doubt that PFC Hartley knowingly and deliberately intended to pull the trigger you must acquit him of the charge of murder.' "

This requested instruction was discussed between the law officer, defense counsel, and trial counsel. At one point in that discussion the law officer, referring to the instruction, stated, "I will accept that." A very short time thereafter the law officer stated, again referring to the requested instruction, "I think I will cover it by an intentional act that would cause death. I think I have it covered." Obviously the law officer was referring to the instruction we have previously quoted and which included the language:

". . . In the latter [case], killing while engaged in an inherently dangerous act, the malice required is the intentional doing of the act which caused death and which is inherently dangerous to others and evinces a wanton disregard for the lives of others."

**255**

All of the authorities agree, and we reiterate, that in murder by engaging in an act inherently dangerous to others it is required that death result from an *intentional act of the accused*. In the case at bar defense counsel in effect argued that the only act coming within the pertinent provision of the Code was an intentional pulling of the trigger.

We need not decide, under the circumstances of this case, whether proof of that act alone was essential to a conviction of murder under Article 118(3). Suffice to say, the instruction as requested served to put the law officer on notice of the necessity to tailor his instructions in such a manner as to advise the court members of the identity of the act or acts which it must find were deliberately committed by the accused, in order to sustain a conviction. United States v Smith, 13 USCMA 471, 33 CMR 3. When a definition of terms is required for a proper understanding of the issues involved, it is the responsibility of the presiding officer to instruct the court members with extreme precision. United States v Sanders, 14 USCMA 524, 34 CMR 304. This he did not do and the court members were without lucid guideposts upon which to base their determination. Unenlightened, they were left to shop around and to pick and choose from among the many acts of the accused. Some of them, at least to the laymen untrained in the law, were apparently dangerous, but not all of them, individually, were of sufficient stature as to provide the implication of malice so necessary to a conviction for this offense and without which no more than manslaughter is made out.

In the context of this case, we believe there is at least a fair risk that the court did not properly understand and utilize the correct standard for its findings. And where there is room for reasonable doubt, such doubt must be resolved in favor of the accused. United States v Sanders, supra; United States v McIntosh, 12 USCMA 474, 31 CMR 60; United States v Lombardi, 14 USCMA 466, 34 CMR 246.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Army. A board of review may affirm the offense of manslaughter and reassess the sentence or a rehearing may be ordered.

Judge FERGUSON concurs.

QUINN, Chief Judge (dissenting):

The record of trial leaves no doubt that defense counsel construed the instructions on the "intentional doing of the act which caused death and which is inherently dangerous to others" as adequately including the defense theory that a finding of guilty of murder under Article 118(3) depended upon whether the accused deliberately pulled the trigger of the gun. The record also leaves no doubt, in my mind, that the court members understood the instructions in the same way.

The instructional pattern was clear: For the offense charged, the court-martial had to find both an intent to kill and premeditation; for the first lesser offense, it had to find an intent to kill without premeditation; for the second type of murder, the court-martial was required to find the accused directed "an inherently dangerous force in such a manner . . . as to knowingly hazard the lives of others"; and, finally, for involuntary manslaughter, the court had to be convinced beyond a reasonable doubt that the accused demonstrated "a culpable disregard for the foreseeable consequences to others" of his actions. In the context of the evidence, the phrase "directing of an inherently dangerous force" did not contemplate a complex of many acts, as the majority maintain, but only the deliberate firing of the pistol. In fact, the majority concede the instruction was offered by the law officer as a specific substitute for that requested by defense counsel, and the latter expressed his agreement with the substitute. See United States v Anderson, 13 USCMA 258, 32 CMR 258; United States v Merrow, 14 USCMA 265, 34 CMR 45. I would, therefore, affirm the decision of the board of review.