**UNITED STATES, Appellee,**

v.

**Private First Class Mark F. McMO-NAGLE, 208–62–9929, United States Army, Appellant.**

**ACMR 9001787.**

U.S. Army Court of Military Review.

28 Feb. 1992.

For Appellant: Peter F. Vaira (argued), James A. Georges, Captain Brian D. Bailey, JAGC, Captain Emmett G. Wells, JAGC (on brief).

For Appellee: Captain Glenn L. Kirschner, JAGC (argued), Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Captain Timothy W. Lucas, JAGC (on brief).

Before NAUGHTON, HOWELL and JOHNSTON, Appellate Military Judges.

## OPINION OF THE COURT

HOWELL, Judge:

Contrary to his pleas, the appellant was convicted by a general court-martial composed of officer and enlisted members of murder while engaged in an act inherently dangerous to others,[1] conspiracy to obstruct justice, willful disobedience of a commissioned officer (three specifications), obstruction of justice, and wrongful discharge of a firearm, in violation of Articles 118, 81, 90, and 134, 10 U.S.C. §§ 881, 890, 934. The appellant was sentenced to a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to Private E1. The convening authority approved the sentence.[2]

Through counsel, the appellant has assigned nine errors. With respect to the murder conviction, the appellant contends that the findings of guilty were incorrect in both law and fact; that the victim's death, if the Court of Military Review finds that the appellant killed her, amounted to excusable homicide; and that the findings instructions given by the military judge to the members were prejudicially erroneous. On various grounds, the appellant also challenges his convictions of conspiracy to obstruct justice, obstruction of justice, willful disobedience of orders, and wrongful

---

1. The appellant was charged with unpremeditated murder under Uniform Code of Military Justice Article 118, 10 U.S.C. § 918 (1982) [hereinafter UCMJ]. At trial the prosecution proceeded on alternative theories of guilt under Article 118(2) (murder with intent to kill or inflict great bodily harm) and Article 118(3) (murder while engaged in an act inherently dangerous to others). The military judge instructed on both theories. On the findings worksheet, the court members indicated they found the appellant guilty of a violation of Article 118(3). *See* Footnote 3 below.

2. This case is a companion to *United States v. Gussen*, 33 M.J. 736 (A.C.M.R.1991), and *United States v. Finsel*, 33 M.J. 739 (A.C.M.R.1991). In all three cases, the appellants challenged, on identical grounds, the legal sufficiency of their related conspiracy to obstruct justice and obstruction of justice convictions. *Gussen* and *Finsel* also dealt with issues concerning orders violations similar to those in this case.

discharge of a firearm. We will affirm the appellant's convictions, with the exception that, as to the three disobedience specifications, we will affirm findings of a failure to obey a lawful general order, and failure to obey other lawful orders in violation of Article 92, 10 U.S.C. § 892, in each case.

## I. Factual Background

In December 1989 the appellant, an infantry soldier, deployed with his unit from Fort Ord, California, to the Republic of Panama, as part of Operation Just Cause. After some preliminary missions, his company moved in early January to Rio Abajo, a neighborhood of Panama City, and set up its command post at Moscote College, a local high school. All soldiers from the company were bivouacked on the school grounds and conducted their operations from the school. From late December through 25 January 1990, the company did not experience any hostile actions, and the threat level was considered low. However, the unit maintained a secure posture to deter terrorist-type attacks.

On 25 January the appellant, his acting squad leader, Sergeant (SGT) Paul Finsel, and another squad member, Private First Class (PFC) Marc Gussen, spent the early evening resting and drinking rum and whiskey at the school. About 2100 hours SGT Finsel obtained permission from their platoon sergeant, Staff Sergeant (SSG) Carlos Cavello, for himself, PFC Gussen, and the appellant to go to a nearby McDonald's restaurant. Once the three soldiers left the school grounds, however, they headed for "the whorehouse up the street," a bar/brothel known as the Fenix Club.

At the Fenix Club SGT Finsel once again began drinking alcoholic beverages. Perhaps apprehensive of the soldier's weapons, several Panamanians persuaded the three to put aside their M16 rifles. SGT Finsel took out a nine-millimeter pistol loaned to him by his unit commander and began showing it to two Panamanian men. He then laid the pistol on a table. During this time, the appellant went to a back room for ten to twenty minutes with a Panamanian woman and apparently had sex with her. As he rejoined his companions, someone shouted that the military police (MP's) were nearby. The three soldiers quickly hid in the back room. When no MP's appeared, they emerged about fifteen minutes later and discovered that the pistol was missing.

After searching frantically but unsuccessfully for the pistol, SGT Finsel and the appellant agreed to stage a sham firefight to explain its loss. Joined by PFC Gussen, the three soldiers fired their M16s into the air while standing in the street outside the Fenix Club. They then ran toward the school. On the way, they met other soldiers coming from the school who were responding to the gunfire. SGT Finsel claimed that men with AK–47 rifles had fired at him from a black Toyota and that he was also receiving fire from a rooftop. From an uncovered position in the street SGT Finsel began firing up at a three-story building. In the darkness, the situation quickly became confused and chaotic.

At one point the appellant, apparently still cooperating with SGT Finsel's ruse, yelled "There he goes!" or "There they go!" and ran into an alley leading to a courtyard. This was the first of two times during the purported firefight that the appellant entered the courtyard where the victim was later shot. Inside the courtyard, he began kicking apartment doors and shouting "They went in there!" SSG Cavello, who followed the appellant into the courtyard, told him to cool down ("chill the fuck out"). SSG Cavello then heard the appellant shout "Alto! Stop! I told you to stop!" and "Put your hands up!" He saw the appellant shouting and pointing his M16 at an unarmed woman clad in a wraparound garment. SSG Cavello finally convinced the appellant that the woman was not a threat and the appellant lowered his weapon. A Panamanian man, who identified himself as the woman's husband, was also present.

The appellant and SSG Cavello returned to the street where the unit commander, Captain (CPT) John Sieder, ordered the company to fall back to the school. At CPT Sieder's direction, the appellant remained behind as part of a small rear se-

curity force. SGT Finsel also remained behind. A short time later, when CPT Sieder discovered that SGT Finsel still had not returned to the school, he directed SGT Timothy Verrender to retrieve him. As SGT Verrender headed back up the street, a new round of gunfire erupted.

SGT Edwardo Pagan, a unit member who was looking up the street from the school, and Private Bradley Smith testified that the appellant shouted for someone to give him cover because he heard some noise or saw some movement. SGT Pagan then observed the appellant disappear alone down the alley leading to the courtyard where the woman was encountered earlier. Though now out of view, SGT Pagan heard the appellant shout "Stop!" twice in Spanish followed by tracer rounds being fired from within the courtyard. SGT Pagan testified that he saw tracers only within the courtyard and stated that no other firing was going on. Hearing cries that someone had been shot, SGT Verrender entered the courtyard and discovered the appellant and the victim, Mrs. Leila Panay. Mrs. Panay, a Panamanian woman about fifty years old, had been seriously wounded by a gunshot and died at the school shortly thereafter.

Mr. Jorge Panay–Romero, the victim's husband, testified that his wife had left their ground floor apartment to take a shower in the bath enclosure located in the courtyard. Suddenly the lights went out and there was a fusillade of gunfire. As he sat at a small table just inside the residence doorway, Mr. Panay felt something hit him. Assuming it was a bullet, he advised his wife to get down, but apparently she had already been shot. Mr. Panay could not identify who shot his wife. Based on his testimony, however, it is clear that Mrs. Panay was the woman detained by the appellant in the courtyard earlier that evening. Mr. Panay's testimony further indicates that other Panamanian civilians were in the apartments surrounding the courtyard that night.

Corporal (CPL) Allan McKinley, who entered the courtyard shortly after the burst of gunfire that killed Mrs. Panay, found the appellant still in the courtyard and observed him fire several rounds at what the appellant described as a "silhouette" on top of a three-story building. CPL McKinley testified that he never spotted any targets on the top of that building. He accompanied the appellant back out to the street where they linked up with SGT Finsel and several other soldiers. There CPL McKinley again observed the appellant fire at alleged targets on the roof of the three-story building, while SGT Finsel fired wildly down the street.

Several witnesses other than CPL McKinley who were present during the alleged firefight testified concerning whether there was any hostile incoming fire and whether there were any hostile targets present on the night of 25 January 1990. SGT Clifford Miller testified that, although the appellant and SGT Finsel claimed to see a "silhouette" atop the three-story building, and although both were firing at the top of the building, SGT Miller never saw any target. Nor was he able to get confirmation from other soldiers who were in a position to see the top of the building that there was any target there. Regarding hostile fire, SGT Miller testified that at first he thought he was receiving incoming fire from the top of a building. When asked if there was any hostile fire coming from the three-story building after he joined SGT Finsel, SGT Miller stated, "No, the only rounds that came down there was the ones that Sergeant Finsel shot from the roof [sic] and ricocheted back at his legs." Additionally, PFC Gussen, when asked if he thought he was in a firefight when he fired his weapon, stated, "I knew I wasn't, sir." Indeed, although some soldiers thought they were under fire, witness testimony and the physical evidence indicates there never was any actual hostile fire that night and the only weapons fire came from U.S. soldiers, principally SGT Finsel and the appellant.

At trial the appellant elected not to testify on the merits. However, in a pretrial statement (Prosecution Exhibit 5) obtained by a criminal investigator the day after Mrs. Panay's death, the appellant acknowledged going to the Fenix Club and later

cooperating with SGT Finsel to cover up the loss of the pistol by staging a bogus firefight. He described only a single entry into the courtyard, that being the one when Mrs. Panay was shot, as follows:

I moved across the street towards an alley. I heard fire all over, but I saw something move in the alley. I went down about ten feet and I stopped. Rounds were being fired from all over the place. I couldn't tell where they were coming from, or where they were going. Everyone was just firing up the three story apartment on the main street. I started moving on down the alley and at least fifteen rounds came over my head by about fifteen feet. There was just a burst. There was definitely more than one weapon being fired, and I was in a crouch position. I walked further in and saw rounds hit the rubble which was about a foot in front of me by now. I saw a shadow move across the building in front of me really fast. I said Alto, Alto, and took my weapon off safe, put it on Semi, and fired six pulls of the trigger. I did not count, but I pulled the trigger approximately six times. When I stopped firing, I noticed there were a lot of rounds in the wall at the back of the building. I put my weapon back on safe, ran up to where I shot at the shadow. Not all the way, but close enough to see a man run out and say my wife, my wife. He got about two feet from me saying this. I turned around and started moving back and screamed for a medic. CPL McKinley came to the area. SFC Verranda [SGT Verrender] came over and started taking care of the person I hit.

. . . . .

The alley was dark, I was scared, rounds were fired at me, and over top of me, I saw the silhouette running I said alto twice, it didn't stop so I fired at it.

Later investigation revealed one bullet hole in the window of the Panay quarters, four in the back wall, and one in the wall below the window. Concerning the identity of Mrs. Panay's killer, the defense submitted evidence to show that someone other than the appellant fired the fatal shot. Regarding the bullet holes in the Panay quarters, for example, trajectory evidence was offered to demonstrate that the bullet came from a location other than the appellant's. Additionally, Special Agent (SA) Andre Dierking, the Criminal Investigation Command case agent, testified that thirty-seven spent M16 shell casings were collected by investigators from three locations in the courtyard. According to a laboratory analysis, SGT Finsel fired twenty-two of these rounds and the appellant fifteen. Casings from both weapons were found at each of the three courtyard locations. SA Dierking could not confirm that the rounds were fired at the exact spots where the casings were retrieved; some had been moved by residents who were cleaning the area.

Although a detailed autopsy was done by Panamanian authorities, the prosecution offered only the testimony of Lieutenant Colonel (LTC) Michael McCaffery, the 2d Brigade Surgeon, concerning the medical cause of death. LTC McCaffery examined Mrs. Panay's body at the school immediately after her death and concluded that she died from a small-caliber gunshot wound. He testified that the bullet entered Mrs. Panay near the umbilicus, passed through her body at a forty-five degree angle, and exited through the upper part of the left hip. According to the defense, this testimony was further proof that the appellant did not kill Mrs. Panay.

## II. Murder While Engaged In An Act Inherently Dangerous to Others (Article 118(3))

At trial the members convicted the appellant of murder in violation of Article 118. The record indicates that the members based their findings on Article 118(3), murder while engaged in an act inherently dangerous to others.[3] Therefore, we will limit

3. During instructions prior to findings, the military judge properly instructed the court members concerning alternative theories of murder under Articles 118(2) and 118(3). The military judge also instructed the members, "You must vote on them separately. You cannot have half of you unpremeditated murder and half of you under murder while engaging in acts inherently

our review to a consideration of whether a conviction under Article 118(3) can stand.

Known as "depraved heart" or "depraved indifference" murder, *see* Milhizer, *Murder Without Intent: Depraved–Heart Murder Under Military Law,* 133 Mil. L.Rev. 205–248 (1991), the UCMJ, and the Manual for Courts–Martial define this type of murder as an unlawful killing where the perpetrator's conduct is "inherently dangerous to others" and shows a "wanton disregard for human life," a disregard "characterized by heedlessness of the probable consequences ... or indifference to the likelihood of death or great bodily harm." Manual for Courts–Martial, United States, 1984, Part IV, para. 43c(4)(a) [hereinafter MCM, 1984].

To convict the appellant of murder under Article 118(3), the evidence must establish beyond a reasonable doubt that:

(1) Mrs. Panay is dead;

(2) Her death resulted from the appellant's intentional act of shooting her with an M16 rifle;

(3) This act was inherently dangerous to others and showed a wanton disregard for human life;

(4) The appellant knew that death or great bodily harm was a probable consequence of the act; and

(5) The killing was unlawful.

### A. Sufficiency of Evidence

■ Initially the appellant challenges his murder conviction on the premise that the prosecution's proof is both legally and factually insufficient. In military law the tests for legal and factual sufficiency are well-established. Under *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), the test for legal sufficiency is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt. For factual sufficiency, the test is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, the members of the Court of Military Review are themselves convinced of the accused's guilt beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987), *review denied,* 28 M.J. 78 (C.M.A.1989); *United States v. King,* 32 M.J. 558, 562 (A.C.M.R.1991), *review denied,* 33 M.J. 481 (C.M.A.1991). After carefully examining the record, we conclude that the evidence satisfies these tests.

■ In support of his sufficiency argument, the appellant contends that the prosecution failed to prove adequately (1) that the appellant killed Mrs. Panay, (2) that the appellant's act posed a danger to "others," (3) that the appellant exhibited a "wanton disregard for human life" in general, and (4) that the appellant's conduct showed malice. In his first assignment, the appellant argues that the prosecution failed to prove Mrs. Panay was killed by an M16 rifle, or that the appellant fired the shot that killed her. The evidence establishes that the appellant entered the courtyard alone, fired shots in the direction of the Panay apartment, and immediately discovered Mrs. Panay dying from a gunshot wound in front of her quarters. There is no convincing evidence of anyone else firing a weapon in or into the courtyard at the critical moment Mrs. Panay was wounded. Based on our review, the only reasonable hypothesis that can be drawn from the evidence is that Mrs. Panay was killed by an M16 bullet fired by the appellant when he allegedly saw the shadow on the wall. With respect to evidence concerning the

dangerous to others." However, when the President announced the findings, he did not specify verbally on which theory the members based their finding of murder. On the Findings Worksheet (Appellate Exhibit XXXIV), there is a pencilled notation, apparently added by the members during their deliberations, that reads "Theory 2—while committing an act dangerous to others," indicating that the court reached its

finding under Article 118(3). During oral argument before this Court, counsel for both sides agreed that the appellant was convicted of a violation of Article 118(3). We agree with Judge Johnston's suggestions in Footnote 4 of his dissent, which would have avoided any question concerning the court's findings as to this offense.

trajectory of the bullets that entered the Panay apartment, and the appellant's own description of bullets impacting near him in the courtyard, the members obviously found that this evidence was either not credible or not of sufficient weight to raise a reasonable doubt. We concur. Even if there is differing evidence, the court can still find beyond a reasonable doubt that the accused is guilty. *See United States v. Bigger*, 8 C.M.R. 248, 251 (A.B.R.1952), *aff'd*, 8 C.M.R. 97 (C.M.A.1953).

 In his second assignment, the appellant argues that the prosecution failed to prove that the appellant's act of firing his weapon in the courtyard placed more than one person at risk of death or great bodily harm, or showed a wanton disregard for human life in general. Under military decisional law, the accused's misconduct must be dangerous to "others" in a multiple sense, Milhizer, *supra*, at 241, and "evince a wanton disregard for human life *in general.*" *United States v. Berg*, 30 M.J. 195 (C.M.A.1990), *adhered to on reconsideration*, 31 M.J. 38, 39 (C.M.A.1990). Military appellate courts have interpreted UCMJ art. 118(3) to require that at least one person besides the victim must face a very high risk of death or great bodily harm because of the accused's conduct. *Berg*, 31 M.J. at 40; *United States v. McDonald*, 15 C.M.R. 130, 133 (C.M.A.1954). After testing the evidence for both legal and factual sufficiency, we are satisfied that persons other than Mrs. Panay were placed in mortal jeopardy by the appellant's act, including Mr. Panay who was also hit by some object at the moment of gunfire.

 Arguing further on this point, the appellant cites *United States v. Holsey*, 10 C.M.R. 52 (C.M.A.1953); *United States v. Davis*, 10 C.M.R. 3 (C.M.A.1953); and *United States v. Jacobs*, 9 M.J. 794 (N.C.M.R. 1980) for the proposition that the accused's conduct must be *directed* at more than one person to establish a wanton disregard for human life in a multiple sense. In the appellant's view, his act must have been committed without special design upon Mrs. Panay in order to meet the requisites of Article 118(3). According to the appel-

lant, since his act was directed at a particular person, not a group, the prosecution's evidence thus fails to show a wanton disregard for human life in general as required by the statute. However, in the context of Article 118(3), we believe that whether the appellant directed his act toward one or more than one person is not the decisive factor for this issue. At all times the proper analytical focus should be on the larger question of whether the act was dangerous to others and showed a wanton disregard for the lives of others. Thus, even if we assume that the appellant's "animus" was directed toward a fleeing shadow, this does not preclude a finding of guilty under Article 118(3), provided his conduct constituted an act inherently dangerous to others and showed a wanton disregard for human life in general. *Berg*, 30 M.J. at 199; *see also, McDonald*, 15 C.M.R. at 133.

In this case, there was ample evidence to prove others were present in or immediately adjacent to the courtyard, and that the appellant knew of their presence (because of his earlier entry into the courtyard) when he fired the fatal shot. *Cf. United States v. Judd*, 27 C.M.R. 187 (C.M.A.1959) (the court found that, because the appellant was aware two people were in the room close together and he was holding his weapon in such a manner as to bring one person within the scope, he evinced a wanton disregard for the life of both persons). Moreover, he purportedly fired his weapon not at a person he actually recognized as an enemy, but at an unidentified "shadow," aiming his fire directly toward an occupied residence in a dark, heavily populated area, with no apparent care for those whose lives he endangered. Applying the tests for legal and factual sufficiency, we are satisfied that the appellant's act was dangerous to others and showed a wanton disregard for human life in general.

 In his third assignment, the appellant contends there is no proof of "malice" because he was operating under the control of his superiors and believed he was under hostile fire. In the context of Article 118(3), the term "malice" refers to conduct

that creates a very high risk of death or great bodily harm without justification. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* § 70, at 542–544 (1972); Milhizer, *supra*, at 211. Under military case law, the required malice can be inferred from the intentional doing of an act that is inherently dangerous to others if the act shows a wanton disregard for human life. *United States v. Vandenack*, 15 M.J. 230 (C.M.A.1983); *United States v. Hartley*, 36 C.M.R. 405 (C.M.A.1966). When the appellant's conduct is analyzed by these standards, and such factors as the extreme risk of death posed by his actions, the extent of his knowledge of what was happening, and the social utility of his conduct, are weighed in the balance, we conclude that his act of firing a lethal weapon into an inhabited dwelling exhibited a wanton disregard for human life in general.

Throughout these events, the appellant consciously engaged in conduct that he knew or should have known would create a very high risk of death or great bodily injury. Thus, he voluntarily joined in the ruse that precipitated the "firefight" and helped escalate the incident through his continuous overly-aggressive actions and firing of his M16. This conduct led directly to his presence in the courtyard and ultimately to the death of Mrs. Panay. At the courtyard, even though the appellant knew how the incident began, and knew further that civilians were in the immediate area, he consciously disregarded the risk to their lives as well as to the lives of his fellow soldiers by firing a lethal weapon toward an occupied dwelling. Under the circumstances, and in light of the appellant's knowledge, these actions reflected a distinct disregard of the foreseeable dangers and a lack of proper care and caution.

■ We find also that there was no legal justification or excuse for the appel-

lant's conduct.[4] It should have been apparent to the appellant that his fellow soldiers at the school would react as they did, and that there was a great risk they would turn their firepower on the community they were there to protect.[5] As to the immediate act that killed Mrs. Panay, the appellant's act of firing his M16 at a purported shadow in a closed courtyard inhabited by civilians, together with his knowledge that the firing began as a sham, was so inherently dangerous as to eliminate any justification. His repeated firing at alleged silhouettes on rooftops both before and after Mrs. Panay was shot illuminates the heedless, indifferent attitude he exhibited at the critical moment in the courtyard. Nor are we persuaded by the appellant's argument that he was following orders. He was told several times by a superior to "chill out," not to shoot, and to head back to the school. Indeed, his behavior was contrary to the supervision by his superiors.

■ As another basis for challenging the sufficiency of the evidence, the appellant contends that the prosecution evidence fails to corroborate his pretrial statement, and thus the statement is a nullity. We note that this statement was admitted into evidence without objection by the defense. As to its essential facts, however, the pretrial statement is consistent with and amply supported by the other evidence. Other testimony unequivocally placed the appellant in the courtyard yelling "Alto," firing his weapon at the fatal moment, and calling for a medic. To sustain a conviction, the corroboration needed for a confession or admission may be very slight and need not be sufficient for conviction by itself. *United States v. Melvin*, 26 M.J. 145 (C.M.A.1988); *see United States v. Rounds*, 30 M.J. 76 (C.M.A.1990), *cert. denied,* ─ U.S. ─, 111 S.Ct. 130, 112

---

**4.** We do not view this event as a combat incident, but rather as a continuing ruse or hoax, a trick designed to deceive the other members of the unit, particularly those in authority. The criminality of the appellant's conduct must be judged in that context.

**5.** Some witnesses testified that they thought hostile fire was being directed at them. However,

the evidence indicates that most of the soldiers, though alert, were skeptical as to whether they were really receiving fire and limited their response accordingly. Contrariwise, there is ample evidence that keeping alive the deception was a substantial motivating factor in the appellant's actions at all times.

L.Ed.2d 98 (1990). We conclude that the evidence sufficiently corroborated the pretrial statement.

Additionally, the appellant argues that the prosecution's evidence fails to exclude every reasonable hypothesis except the appellant's guilt. *Bigger*, 8 C.M.R. at 251. To meet the standard of proof in a circumstantial case of murder under Article 118(3), the decisive test is the cumulative effect of all the circumstances considered *in toto*. *See United States v. Littlehales*, 19 M.J. 512, 516 (A.F.C.M.R. 1984), *aff'd*, 22 M.J. 17 (C.M.A.1986), *cert. denied*, 476 U.S. 1174, 106 S.Ct. 2901, 90 L.Ed.2d 987 (1986). However, "[t]he standard of proof in a circumstantial evidence case is no higher than that required in a direct evidence case ... and that a homicide conviction results does not change the rule." 19 M.J. at 516. Thus, even if there is differing evidence, the court can still find beyond a reasonable doubt that the accused is guilty. 8 C.M.R. at 251. The rule does not require that the court be satisfied beyond a reasonable doubt of each link in the chain of circumstances relied upon to establish the accused's guilt. *Bigger*, 8 C.M.R. at 251. We are satisfied that the proof meets these standards and supports the appellant's conviction legally and factually.

### B. Instructions

With respect to his murder conviction, the appellant challenges the military judge's refusal to give instructions on accident and mistake of fact as requested by the trial defense counsel. The Manual for Courts–Martial "delineates those special or affirmative defenses available by which an accused, although not denying that he committed the objective acts constituting an offense, denies responsibility for those acts." *United States v. Johnson*, 25 M.J. 691, 694 (A.C.M.R.1987); Manual for Courts–Martial, United States, 1984, Rule for Courts–Martial 916 [hereinafter R.C.M.]. Among the special defenses thus delineated are accident and mistake of fact. R.C.M. 916(f), 916(j). The military judge concluded that the appellant was not entitled to either instruction. We agree.

Under military law, an affirmative defense is reasonably raised and must therefore be instructed upon when "the record contains some evidence to which the military jury may attach credit if it so desires." *United States v. Bradford*, 29 M.J. 829, 832 (A.C.M.R.1989), *reconsideration denied*, 29 M.J. 1057 (A.C.M.R.1990) (quoting *United States v. Simmelkjaer*, 40 C.M.R. 118, 122 (C.M.A.1969)). Only "some evidence" is required to trigger the judge's instructional duty. This evidence need not "be compelling or convincing beyond a reasonable doubt." 29 M.J. at 832 (quoting *United States v. Jackson*, 12 M.J. 163, 166 (C.M.A.1981)). Additionally, the testimony of the accused alone may be sufficient to raise an issue requiring an instruction, although the accused need not actually testify. *Bradford*, 29 M.J. at 832. Thus, a pretrial statement of the accused admitted into evidence may be sufficient for this purpose. 29 M.J. at 832. Any doubt whether the evidence is sufficient to require an instruction should be resolved in favor of the accused.

Addressing the standard as to when an accident instruction must be given, the Court of Military Appeals has identified three elements of proof that must be met. First, evidence must be introduced that the accused was engaged in an act not prohibited by law, regulation, or order. Secondly, this lawful act must be shown by some evidence to have been performed in a lawful manner, that is, with due care and without simple negligence. Thirdly, there must be some evidence in the record of trial that this act was done without unlawful intent. *United States v. Ferguson*, 15 M.J. 12, 17 (C.M.A.1983). Moreover, if an act is intended and directed at another, accident is not raised simply because the ultimate consequence of the act is unintended or unforeseen. *United States v. Pemberton*, 36 C.M.R. 239 (C.M.A.1966).

Applying these principles to the military judge's refusal to give the accident instruction, we conclude his ruling was legally correct. In the first place, assuming the "shadow" seen by the appellant was

that of Mrs. Panay, her death was neither unintended nor unexpected. According to the appellant's pretrial statement, he clearly intended to fire his M16 at a moving shadow. Moreover, these were not warning shots. The appellant's purpose was to harm the fleeing shadow. Thus, Mrs. Panay's death from the appellant's intentional use of a dangerous weapon with such violence as ordinarily results in the infliction of serious injury cannot be described as an accident.

Secondly, the appellant's negligent acts and improper motivation throughout these events also support the military judge's ruling. In his pretrial statement, the appellant acknowledges his complicity in precipitating the events that led to Mrs. Panay's death. Moreover, there is evidence that throughout the sham "firefight," including during the appellant's second time in the courtyard, he continued to act with the improper purpose of covering up the loss of the pistol, his earlier presence at the Fenix Club, and his efforts in starting the "firefight." To be entitled to an accident instruction where death has occurred, the slayer's acts must be free from negligence and guided by a legitimate purpose. In this case, the evidence indicates otherwise.

█ Next, we turn to the appellant's assertion that he was entitled to a mistake of fact instruction in conjunction with Article 118(3), an issue that presents a more complicated question. At trial, the trial defense counsel requested the instruction on mistake in relation to the element of "intent to kill" required by Article 118(2) (unpremeditated murder). The proferred mistake asserted at trial and again now before this Court was the accused's belief, as indicated in his pretrial statement, that he was firing at an enemy combatant when he killed Mrs. Panay. After first agreeing to give the requested instruction, the military judge later reversed course, reasoning that the accused's mistaken belief would apply to the element of "unlawfulness" of the killing, but not the element of "intent to kill." Consistent with this rationale, the military judge thereafter instructed the members that, to be unlawful, the ac-

cused's act must be done without legal justification or excuse. In relation to Article 118(2) only, he further instructed the members that "if the accused honestly and reasonably believed that he was firing in response to an enemy or any other type of combatant, ... his actions would be justified." This latter charge was not given concerning the alleged offense of murder while engaged in an act inherently dangerous to others (Article 118(3)) or the lesser included offenses of involuntary manslaughter (Article 119, 10 U.S.C. § 919) and negligent homicide (Article 134). Instead, with respect to involuntary manslaughter and negligent homicide, the military judge merely repeated his previous instruction that an unlawful killing must have occurred without legal justification or excuse. For Article 118(3), the military judge apparently inadvertently omitted instructing the members that "unlawfulness" means without legal justification or excuse. However, viewing the instructions as a whole, we do not believe this omission misled the members or otherwise prejudiced the appellant. Moreover, we do not believe that once the military judge defined the term "unlawful" he need repeat the definition over and over again, although in this case he explained it two more times. We are satisfied the members understood the meaning of the term "unlawful."

█ The appellant now contends that the military judge should have given a mistake of fact instruction in relation to two of Article 118(3)'s five elements. First, he asserts that his mistaken belief is material to the element of "unlawfulness" because it provides legal justification or excuse for the act of firing his M16. Secondly, the appellant contends that his belief goes to Article 118(3)'s requirement that the inherently dangerous act show a "wanton disregard for human life." He equates "wantonness" with "willfulness" or "purposive conduct" and argues that this brings the element of "wanton disregard" within the coverage of R.C.M. 916(j). We disagree and conclude that the mistake of fact instruction was not available as to either element.

Generally, under military law "it is a defense to a charged offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." R.C.M. 916(j). As Judge Alley noted in *United States v. Calley*, 46 C.M.R. 1131, 1179 (A.C.M.R.1973), "to be exculpatory, the mistaken belief must be of such a nature that the conduct would have been lawful had the facts actually been as they were believed to be." Additionally, the Manual for Courts–Martial recognizes that a mistake of fact is a defense only when it negates the existence of a mental state that is essential to the crime charged. R.C.M. 916(j); LaFave & Scott, *supra*, at 356. Thus, mistake of fact is normally available as a defense if the mistake goes to an element requiring premeditation, intent, willfulness, or knowledge. However, if "knowledge or intent is immaterial as to an element, then ignorance or mistake is not a defense." R.C.M. 916(j).

To raise an issue of mistake of fact as to Article 118(3), the mistake therefore must negate a mental state of the accused that the prosecution must necessarily prove to establish the offense. In our view, only two elements of Article 118(3) require the prosecution to prove a mental state of the accused. First, Mrs. Panay's death must have resulted from an intentional act of the appellant. Secondly, the appellant must actually have known that death or great bodily harm was a natural and probable consequence of his act. There is no evidence to indicate that the appellant's mistaken belief would go to either of these elements.

Specifically addressing the appellant's argument that "wanton disregard" involves "willfulness," a mental state, we conclude that the law does not require proof of willfulness to establish "wanton disregard." By definition, wantonness is characterized by heedlessness or indifference, neither of which connotes willfulness. Indeed, the primary emphasis of this element of Article 118(3) is not on the state of the accused's mind, but on the circumstances of his conduct. Whether the accused acted with wanton disregard is a qualitative judgment to be made by the factfinder in determining the extent of the accused's criminal action. It is inaccurate to view the factfinder's evaluative process for this element as a *mens rea* assessment. Instead, the proper focus is on an objective assessment of the degree of risk presented by the accused's reckless conduct. In making this evaluation, the factfinder examines all the surrounding circumstances, particularly those apparent and known to the accused, or those that at least should be apparent to and known by him. The final judgment does not describe the *mens rea* involved in the commission of a crime or an element of a crime that can be negated by a mistaken belief such as the appellant claimed he had. *People v. Register*, 90 A.D.2d 972, 456 N.Y.S.2d 562 (1982).

We conclude further that the appellant's alleged mistaken belief that he was firing at an enemy combatant would not negate the element of "unlawfulness." As with "wanton disregard," there is no mental state the prosecution must prove to establish this element. Rather than seeking to determine whether the accused believed one thing or another, or had a particular knowledge or intent, the factfinder instead must assess the social utility of the accused's conduct. Through an objective evaluation of the accused's conduct, including his motives for engaging in risky behavior, the factfinder must determine whether the accused's purpose in acting as he did justified creating such a high risk of serious harm. This process does not involve a *mens rea* assessment, and the final resolution does not depend on the accused's state of mind. At all times, the critical focus is on the negligent or reckless nature of the accused's conduct. Based on this, we conclude that the members could properly consider the appellant's purported motive for acting as he did in resolving the issue of "unlawfulness," but his mistaken belief would not in and of itself negate this element. Accordingly, he was not entitled to a mistake of fact instruction.

### III. Willful Disobedience

With respect to the appellant's convictions for willful disobedience (Article 90) of orders not to chamber rounds in his weapon unless necessary for protection of self or others; not to consume alcohol while deployed to Panama; and not to have intimate personal contact with Panamanian females, the government concedes and we agree that the evidence is sufficient to establish the lesser offense of disobedience of a lawful general order and other lawful orders under Article 92 in each case. As to the general order not to chamber rounds (Specification 3, Charge I), we will affirm a violation of Article 92(1). *Finsel,* 33 M.J. 739. Concerning the remaining two orders not to consume alcohol and not to consort with females (Specifications 1 and 2, Charge I), we will affirm a violation of Article 92(2), in each instance. *Gussen,* 33 M.J. 736. Based on these findings, we will reassess the sentence in our decretal paragraph.

### IV. Conspiracy to Obstruct Justice/Obstruction of Justice

The appellant challenges his convictions of conspiracy to obstruct justice and obstruction of justice on the premise that there was no criminal proceeding pending when the appellant committed the allegedly obstructionist acts, citing *United States v. Gray,* 28 M.J. 858 (A.C.M.R.1989) and *United States v. Asfeld,* 30 M.J. 917 (A.C.M.R.1990). The government's theory concerning these charges is that the appellant, SGT Finsel, and PFC Gussen, conspired to conceal SGT Finsel's loss of the pistol by feigning a firefight. The appellant argues that since no official authority had discovered the loss of the pistol or "manifested" any official action concerning the pistol at the time of the feigned firefight, his convictions of these charges cannot stand. We find no merit in the appellant's contention. As this Court said in *Gussen,* there is no requirement for a criminal proceeding to have been initiated before these offenses will lie. It is sufficient that the appellant had reason to believe that criminal proceedings would be commenced when he committed the allegedly obstructionist act. *See United States v. Guerrero,* 28 M.J. 223 (C.M.A.1989); *Gussen,* 33 M.J. at 738. We are satisfied that the evidence is legally and factually sufficient to establish these offenses.

### V. Multiplicity

The appellant contends that his conviction of wrongful discharge of a firearm is multiplicious with either murder while engaged in an act dangerous to others or obstruction of justice. Based on the express wording of the wrongful discharge specification (Specification 2 of Charge III) and the government's position at trial, it is clear that the basis of the specification was the appellant's act of discharging his weapon in the street immediately after leaving the Fenix Club, not his firing of the weapon later in the courtyard. We hold that the trial defense counsel's failure to raise this issue at trial, and the absence of plain error on the part of the military judge, waived any appellate relief. *United States v. Jones,* 23 M.J. 301 (C.M.A.1987); *United States v. Negron,* 28 M.J. 775 (A.C.M.R. 1989), *aff'd,* 29 M.J. 324 (C.M.A.1989). Even if waiver were inapplicable, we would conclude that under the circumstances of this case the offenses of wrongful discharge of a firearm and either murder while engaged in an act inherently dangerous to others or obstruction of justice are not multiplicious for either findings or sentencing purposes.

We have carefully examined the remaining issues asserted by the appellant through counsel and find them to be without merit.

As to Specifications 1, 2, and 3 of Charge I, the Court affirms only so much of the findings in each specification as finds that the appellant did, at the time and place and on the date alleged, and in the manner described in each specification, fail to obey a lawful general order, in violation of Article 92(1), for Specification 3 of Charge I, and fail to obey a lawful order in violation of Article 92(2), for Specifications 1 and 2 of Charge I. The remaining findings of

guilty are affirmed. Reassessing the sentence on the basis of the errors noted and the entire record, and applying the criteria of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the Court affirms only so much of the sentence as provides for a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and reduction to the grade of E1.

Senior Judge NAUGHTON concurs.

JOHNSTON, Judge, dissenting:

This case should be returned to the convening authority for a rehearing. The findings are ambiguous and should be clarified. In addition, the instructions from the military judge were deficient and prejudicial to the accused. Even if these significant legal errors were not present in the case, I would find that the evidence was factually insufficient to sustain the conviction for murder.

### I.

This case has been presented on appeal to this Court by both appellate counsel on the premise that the appellant was convicted of a violation of Article 118(3) of the Uniform Code of Military Justice. That conclusion, however, is not at all clear from the record of trial and the findings worksheet.

Under Article 66(c), 10 U.S.C. § 866(c), this Court may "affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." We cannot perform properly our review function under the mandate of Article 66 if we are uncertain of the precise

offense of which the appellant has been convicted.

The pertinent charge and specification alleges that the appellant "did, at Panama City, Panama, on or about 25 January 1990, murder Leila Edith Dias Panai [sic] by means of shooting her with a M16A2 rifle." This specification format is consistent with the sample specification shown in the Manual. *See* MCM 1984, Part IV, para. 43f.[1] It is also consistent with the model specification shown in the Judges' Benchbook to allege a violation of Article 118(2), more commonly known as unpremeditated murder.[2] Dep't of Army, Pam. 27–9, Military Judges' Benchbook, para. 3–86 (1 May 1982) [hereinafter Benchbook]. It is inconsistent, however, with the Benchbook model specification for an Article 118(3) charge, identified as "[m]urder while engaging in act inherently dangerous to others," in that the words "by engaging in an act inherently dangerous to others" are not contained in the specification and the act or acts are not further identified.[3]

Although I am satisfied that the military judge erred when he failed to require the government to amend the specification to reflect both Article 118(2) and Article 118(3), that deficiency is not plain error and was not prejudicial to the accused. The doctrine of waiver can be applied to the "notice pleading" used in this case as the defense counsel did not request a bill of particulars under R.C.M. 906(b)(6) in order to be informed of the nature of the charge with precision. During an Article 39(a) session early in the proceedings, the trial counsel argued that some evidence the government would present on the merits would show that the accused willfully discharged a firearm showing wanton disregard for human life as required for a

---

1. "In that _____ (personal jurisdiction data), did, (at/on board—location) (subject-matter jurisdiction data, if required), on or about _____ 19__, [with premeditation] [while (perpetrating) (attempting to perpetrate) _____] murder _____ by means of (shooting him/her with a rifle) (_____)."

2. "In that _____ (personal jurisdiction data) did, (at) (on board) _____, (subject-matter jurisdiction data, if required) on or about _____ 19__, murder _____ by means of (shooting

him/her with a rifle) (pushing him/her over a cliff) (running into him/her with an automobile) (_____)."

3. "In that _____ (personal jurisdiction data) did, (at) (on board) (subject-matter jurisdiction data, if required) _____, on or about _____ 19__, murder _____ by engaging in an act inherently dangerous to others, to wit: _____." *See* Benchbook, para. 3–86 III.a.

violation of Article 118(3). Thus, the accused was on notice early in the proceedings that the government was pursuing charges under Article 118(3) as well as Article 118(2). In addition, the defense fully participated in the trial and put on evidence that tended to rebut either offense.

After the presentation of evidence, the trial counsel informed the military judge that the government wished to proceed to instructions on "subdivision two or three" of Article 118. Trial defense counsel did not object. Both government counsel and defense counsel participated in the discussions concerning instructions for Articles 118(2) and 118(3). Government counsel forcefully presented argument addressing both offenses during closing argument, while the trial defense counsel highlighted the evidence that tended to negate both. Instructions from the military judge covered the elements for both offenses.

While I am persuaded that the appellant was not prejudiced in any way by the failure of the government to utilize the proper charging format, the *findings* resulting from that error are a completely different matter.[4] When the members returned from deliberations on findings, the military judge reviewed the Findings Worksheet, Appellate Exhibit XXXIV, and handed it back to the President of the panel who then stated to the appellant that "this court-martial finds you: Guilty of All Charges and Specifications." The announced findings were not further delineated as to the offense involved under Article 118.

During our review of the Findings Worksheet, Appellate Exhibit XXXIV, we noted that the "not guilty" portion adjacent to Charge II (the violation of Article 118) was lined-out with a ball-point pen, indicating that the appellant was found guilty of the charge and specification. A pencil annotation immediately under the lined-out portion, however, states "Theory 2—while committing an act dangerous to others." Other marks on the Findings Worksheet

have been made with a felt-tip pen. Whether the written pencil annotation regarding Charge II was made by the president or other member of the court-martial panel, by someone acting on the instructions of the members, or by others persons after trial cannot be determined from the record.

The Findings Worksheet, which may have contained the pencil annotation at the time the president announced the findings, did not amount to an "announcement" of findings. *See* R.C.M. 921(d). Findings by exceptions and substitutions were not entered to clearly indicate that the accused had been convicted of Article 118(3) rather than Article 118(2). In addition, it is clear that Article 118(3) is not a lesser included offense of Article 118(2). Thus, the record indicates *as a matter of law* that the appellant was charged with and convicted of a violation of Article 118(2) as shown by the *findings that were announced in court.*

If we assume that the pencil annotation was made by the president acting on behalf of the members, then an issue is raised concerning ambiguous findings. The law clearly requires that findings be certain, definite, and free from ambiguity. *See United States v. Read*, 29 M.J. 690 (A.C.M.R.1989), *review denied*, 30 M.J. 34 (C.M.A.1990). In addition, the military judge has the obligation to ensure that complete findings are announced. *United States v. Johnson*, 22 M.J. 945 (A.C.M.R. 1986), *review denied*, 23 M.J. 253 (C.M.A. 1986). In this case the pencil annotation, if made by the president or members, represents an ambiguous finding that the military judge should have clarified at the time findings were announced in court. *See* R.C.M. 922(d).

Although my brothers assume that the pencil annotation on the findings worksheet indicates that the appellant was found guilty of a violation of Article 118(3), the record of trial does not support that conclusion, and the case law does not permit such

---

4. The government could have avoided these issues entirely by utilizing on the charge sheet and the findings worksheet the more detailed form specifications for Articles 118(2) and

118(3) contained in the Benchbook rather than the incomplete example found in para. 43f, Part IV of the Manual.

latitude.[5] Because I have concluded that, as a matter of law, the appellant was convicted of a violation of Article 118(2), the efforts by his appellate defense counsel to argue the conviction before this Court on the assumption that Article 118(3) was violated denies the appellant a substantial right; appellate review of his conviction under Article 118(2). Conversely, the appellant has no statutory right to a review by this Court of an offense for which he was not convicted (i.e., a violation of Article 118(3)).

Were it not for the ambiguity with the findings worksheet, this case could be reviewed under Article 66 as a conviction for a violation of Article 118(2). In an abundance of caution and mindful that ambiguities in findings should be interpreted to favor the accused, however, I would return the case to the convening authority for a rehearing.

## II.

In this case we are forced to confront the dilemma facing this combat infantryman—was it lawful for him to kill a target even though he had been engaged in prior misconduct by being a conspirator in the sham firefight? In this type of case the tendency is to focus on the effect—a dead innocent civilian, rather than on the actor and the act—a young, scared, combat infantryman who may have fired at what he thought was an enemy soldier.

## A.

I agree with the appellant's contention that the evidence is factually insufficient to support a murder conviction under Article 118(3). There is ample support for the appellant's contention in the record of trial:

1. The record indicates that the appellant fired his weapon into the air while standing in the street outside the Fenix Club. He also fired his weapon during the sham firefight after he requested permission to shoot from his superiors. He then fired three shots at a supposed target on top of the three story building. While the request and firings were part of the sham, the acts hardly evince wanton disregard for human life. The government failed to

---

5. In *United States v. Vidal*, 23 M.J. 319 (C.M.A. 1987), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987), a rape case that concerned liability as a perpetrator or aider and abettor, the court noted that the members are not required to agree as to the particular theory of liability in reaching the two-thirds concurrence necessary for a conviction. The court went on to note that "[t]he only condition is that there be evidence sufficient to justify a finding of guilty on any theory of liability submitted to the members." 23 M.J. at 325.

The reasoning in *Vidal* (i.e. that different theories of guilt can support a conviction for an offense) does not apply to the case at bar. Article 118 includes four fundamentally different offenses, denoted in the statute as clauses (1) thru (4). While it might be argued that the four subdivisions of murder under Article 118 are merely different "theories" supporting a single offense of murder, that approach does not withstand close examination.

First, each of the clauses under Article 118 is treated as a different offense with different elements of proof. Second, there is little doubt that our courts would set aside a guilty finding that was based in part on one subdivision and in part on another. For example, we would set aside a conviction if some of the members in a trial voted for conviction based upon their factual conclusion that an accused acted with premeditation while others members voted for a finding of guilty while relying upon acts inherently dangerous to others.

In this case, the military judge advised the members that they could find the accused guilty under either of two "theories" i.e. "unpremeditated murder or murder while engaging in an act inherently dangerous to others." But he also cautioned the members that they must vote on the "theories" separately. Thus, this case properly treats the two "theories" as two separate offenses.

My problem comes from trying to discern which of the two offenses the members intended to rely upon in reaching their finding of guilty. They apparently considered the offenses separately, but which of them received the necessary majority vote? Does the pencil annotation, the only pencil mark on any of the four pages of the findings worksheet, represent the vote of the members, the individual feelings of the president, or the analysis of the findings after trial by someone seeking to clarify the situation and respond to the trial defense counsel's seven-page request for reexamination of the findings? If the members voted for the offense involving acts inherently dangerous to others, why did they not enter findings by exceptions and substitutions? Did they attempt to perform their duties properly, only to have the military judge fail to clarify the ambiguity created by the pencil annotation on the findings worksheet? *See* R.C.M. 921(d).

prove beyond a reasonable doubt how many other shots were fired by the appellant as part of the sham, or to prove from where those shots were fired.[6]

2. Several soldiers thought the situation was a real engagement with the enemy. They observed what they thought were muzzle flashes from the three story building. They also thought initially that enemy fire was coming down the street at them. There is insufficient evidence in the record to show that the appellant did not think that their sham fight had become the real thing.

3. After the firing during the first phase of the sham firefight stopped, the appellant was required by his company commander to provide rear security for the soldiers as they started moving back to the school from the intersection where the sham incident occurred.

4. The record indicates that the appellant's military superiors conceded that he lawfully entered the courtyard with rounds chambered in his weapon as part of the rear security element. Thus, some of his acts may have been justified.

5. A substantial period of time passed from the time of the first phase of the sham firefight until the appellant fired at the shadow. Mr. and Mrs. Panay had time after the sham firefight and search of the neighborhood to get back in bed and watch television. Mrs. Panay then decided to take a shower to cool off. She was struck by a bullet fired by the appellant as she stood near the shower stall in the courtyard and began to pour water over her body.

6. The appellant did not fire without warning—he called out for his target to stop by yelling "alto, alto" (i.e. "halt, halt") in a loud voice. This action, if sincere, is inconsistent with a wanton disregard of human life.

7. The shots fired by the appellant at the shadow were the first rounds fired by any soldier during the second phase of firing. The government failed to prove beyond a reasonable doubt that the appellant fired the fatal shot as part of the sham firefight.

8. The record indicates that the rounds fired at the shadow by the appellant were intentionally-fired, quickly-aimed shots. Aimed shots intentionally fired at a suspected enemy or enemy location are factually and legally insufficient to support a conviction based on firing in a manner evincing a wanton disregard of human life.

9. Immediately after determining that the shots he fired had struck a civilian rather than an enemy soldier, the appellant called for a medic. This action is inconsistent with a state of mind that evinces a wanton disregard of human life.

### B.

In addition to the factual infirmities I have noted in the government's case, the appellant's *initial actions in the second phase of the incident* may have been performed with justification or excuse.

First, the lawfulness of engaging a target in a war zone is not dependent upon the proximity of actual close combat in time or distance. Proximity to the action merely sheds additional light upon the state of mind of the shooter, but does not make lawful acts unlawful or unlawful acts justifiable. Thus, a soldier who honestly believes he is shooting a lawful enemy target may be justified in the eyes of the criminal law even though his unit has not been in actual combat with an enemy, and the only

---

**6.** My review function under Article 66, was severely hampered by the poor quality of Prosecution Exhibit 2, a double exposed Polaroid-type picture of a large diagram that was used at trial to identify the location of the persons involved in the incident. While a photographic rendering of an exhibit may be permissible under some circumstances, the poor quality of Prosecution Exhibit 2 prevents a thorough review of the unique facts of this case, and denies the appellant a substantial right. In my view, the appellant has been prejudiced by the omission from the record of the actual diagram used as Prosecution Exhibit 2, or, in the alternative, of a photograph of the diagram that clearly identifies all marks made upon that exhibit. In my mind, this issue alone is a sufficient basis to set aside the conviction if the original cannot be produced. *See United States v. Booth,* 33 M.J. 939 (N.M.C.M.R.1991).

real combat has been in some other section of the city.

Second, unlawful conduct by a soldier, even though that conduct may occur immediately prior to engaging a suspected enemy target, does not necessarily make a subsequent shooting unlawful. The prior unlawful conduct of the shooter may, however, be relevant to the finder of fact in determining the soldier's state of mind at the time he fired his weapon. In this case the relevant inquiry is whether the appellant intended to kill what he thought was an enemy target, or whether he was seeking to embellish the sham firefight, heedless of the consequences to civilians known to be in the area.

Third, the rules of engagement imposed by a commander are guidelines pertaining to firing of weapons. Those rules generally are aimed at preventing needless casualties and unnecessary destruction. Even if the rules of engagement are violated, however, the lawfulness of the killing resulting from the firing will be determined by the UCMJ and the law of war. Thus, even though a particular shooting may violate a command-imposed rule of engagement, and thus be subject to punishment under the UCMJ, the killing resulting from that shooting may nevertheless be lawful.

The appellant fired the fatal shot while he was required by his military superiors to provide rear security for his comrades. If he fired thinking he was shooting at an enemy, then the killing was justified, however unfortunate the death may have been.[7] The question before this Court is not whether the accused was mistaken as to the identity of his target, but whether Mrs. Panay was killed, although mistakenly, without legal justification or excuse.

The issue of justification and the lawfulness of the killing may be determined by reference to the so-called "Rendulic Rule"—whether the accused acted within the limits of honest judgement on the basis of conditions as they appeared to him at the time. If the conditions at the time were sufficient for the appellant to honestly conclude that urgent military necessity warranted the decision he made, then he may have erred in the exercise of his judgement, but he was not guilty of a violation of Article 118 when he fired at the shadow.[8] *See* Dep't of Army, Pam. 27–161–2, Trials of War Criminals Before the Nuernberg Military Tribunals; International Law, Vol. II, at 246 (23 Oct.1962).

## C.

Based upon the foregoing factual and legal premise, I am not convinced that the government proved beyond a reasonable doubt that the appellant's actions *in the initial moments of the second phase of the incident* were without justification or excuse, that they evinced a wanton disregard of human life, or that the killing was unlawful. Thus, the record is factually insufficient to sustain the conviction and replete with legal error prejudicial to the appellant's substantial rights.

7. The facts of this case would support a conviction for a violation of Article 118(3) if the military judge instructed the members that they could convict the appellant of the offense only if they found that he did not believe he was shooting at an enemy when he fired his weapon at the shadow in the courtyard. Although the military judge mentioned justification in regard to Article 118(2), he did not give an instruction explaining that concept as it applied to Article 118(3).

I would find prejudice to the substantial rights of the accused for this omission even though the trial defense counsel failed to object to the instructions. The record clearly indicates that the trial defense counsel did not understand the issue of justification from the inception of the trial until after his discussion with the military judge concerning proposed instructions. This failure to understand that the government had the burden to prove that the accused acted without justification or excuse, or to raise the issue as the affirmative defense of justification, may have been ineffective assistance of counsel within the meaning of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

8. In this case the military judge instructed the members under Article 118(2) that the accused's actions would be justified if he "honestly and reasonably believed that he was firing in response to an enemy or any other type of combatant...." This instruction is inconsistent with the subjective standard incorporated in the "Rendulic Rule." The instruction was prejudicial even without a defense objection.

### III.

A soldier who kills an *intended* target, thinking it to be an enemy soldier at the instant of firing, even if he acts without justification or excuse, cannot be convicted, as matter of law, for a violation of Article 118(3). He can be convicted of a violation of Article 118(2), as he clearly had the requisite "intent to kill or inflict great bodily harm upon a person."

Neither the legislative history of Article 118(3), the discussion of the offense in the Manual, nor the case law applicable to the clause, indicates that the provision was intended to apply to the situation where a combat infantryman shoots at an intended target, thinking it to be an enemy.

The two examples of the offense in the Manual, i.e., throwing a live grenade toward others in jest or flying an aircraft very low over a crowd to make it scatter, are materially different from the situation in this case if the accused was determined to shoot at an intended target. *See* MCM, 1984, Part IV, para. 43c(4)(a). Both of those examples involve patently illegal conduct that is inherently dangerous to others.

Each of the significant reported cases dealing with various aspects of Article 118(3) combine the fact of an apparently inadvertent death with conduct that was inherently dangerous and showed a wanton disregard for human life. *See United States v. Davis,* 10 C.M.R. 3 (C.M.A.1953) (victim shot during an armed robbery); *United States v. Holsey,* 10 C.M.R. 52 (C.M.A.1953) (soldier fatally shot during argument); *United States v. Sandoval,* 15 C.M.R. 61 (C.M.A.1954) (angry soldier fired into house occupied by prostitute and perceived interloper); *United States v. Dacanay,* 15 C.M.R. 263 (C.M.A.1954) (soldier shot co-worker during confrontation over girlfriend); *United States v. Stokes,* 19 C.M.R. 191 (C.M.A.1955) (drunken accused discharged weapon in car, killing occupant in front seat); *United States v. Judd,* 27 C.M.R. 187 (C.M.A.1959) (accused shot wife while she stood only a few feet away holding son); *United States v. Hartley,* 36 C.M.R. 405 (C.M.A.1966) (soldier shot another during struggle); *United States v.*

*Jacobs,* 9 M.J. 794 (N.C.M.R.1980) (soldier killed his wife's lover); *United States v. Vandenack,* 15 M.J. 230 (C.M.A.1983) (accused inadvertently killed another driver during a high speed vehicle chase). Unlike those incidents, in this case the appellant clearly intended to kill the enemy target. *See United States v. Berg,* 31 M.J. 38 (C.M.A.1990) (UCMJ art. 118(3) inapplicable; soldier killed companion with gunshot wound to head).

In the case at bar, the killing was not patently unlawful if the accused thought he was shooting at an enemy. The killing here is unlawful only if the government proves beyond a reasonable doubt that the accused acted without justification or excuse, i.e., that he did not think he was shooting at an enemy. If the finder of fact concludes the killing was without justification, then Article 118(2) is the applicable offense as the appellant clearly intended to kill or inflict great bodily harm upon his human target.

### IV.

My brothers have indicated in Footnote 4 of their opinion that the law of the case is not intended to regulate the conduct of a combat infantryman in actual combat conditions. I am troubled, however, by their approach to the issue and the response from government counsel.

During oral argument the government contended, in response to a situation posed by the Court, that Article 118(3) would have been violated by any other soldiers who had *not* been a party to the sham firefight if they had also fired at the shadow believing it to be an enemy. This narrow perception of the lawfulness of the actions of combat infantrymen is flawed and must be corrected.

#### A.

The accused apparently thought that the six rounds he fired during the first few moments of the second phase of the firings were part of a "combat incident." The record can be construed to mean that the accused thought the sham firefight of the first phase of the incident had become actu-

al combat for the start of the second phase. The government had the burden to prove that the appellant killed Mrs. Panay without justification or excuse, a burden that could be met only by proving beyond a reasonable doubt that the accused did not think he was firing at an enemy.

### B.

Several fundamental propositions are important for lawyers and judges to understand when examining the conduct of an infantryman in a combat zone.

First, the mission of a U.S. Army infantryman is to "close with and destroy or capture the enemy." Soldiers who perform that mission aggressively and efficiently are rewarded with commendations, advancement, and decorations for valor.

Second, the combat infantryman exists in wartime to personify acts that are inherently dangerous to others. These soldiers are expected to be "tenacious warriors."

Third, the combat infantryman is not taught to shoot to wound, but to aim for the center of mass of the intended target. The necessary implication is that a human target may be destroyed by either severe wounding or death. Shooting at the center of mass of an intended target, whether by aimed fire or "quick fire" (i.e., instinctively aimed shots), is not wanton disregard for human life in the sense contemplated by Article 118(3).

Fourth, enemy soldiers who are not "out of combat" (i.e., those who are wounded and unable to resist, or who have surrendered) may, under most circumstances, be lawfully killed whether or not they are armed and whether or not they are firing at our soldiers. They may also be lawfully killed by "reconnaissance by fire," a technique that does not require clear identification of a target, and does not of itself show a wanton disregard of human life as prohibited by Article 118(3).

Fifth, war is a horrible, bloody business in which innocent people and friendly forces are killed or wounded by "friendly fire." The death of an innocent person during a combat firing incident where a soldier thinks he is shooting at an enemy target is not a murder within the meaning Article 118(3).

While these observations may apply in varying degrees to the actions of the accused in the initial moments of the second phase of the incident, they are not intended to excuse the morally reprehensible acts he perpetrated. He should be held accountable for his actions in creating the dangerous circumstances that ultimately led to Mrs. Panay's death. He also should answer for firing his weapon in violation of the rules of engagement without clearly identifying his target. But he is not guilty of murder if he truly thought he was firing at an enemy, a question that can be answered by the members only after proper instructions on the law.